WABUNGA LAND CO. *v.* SCHWANBECK.

1. CORPORATIONS—ACCOUNTING—STOCK AND STOCKHOLDERS.
    In a suit by two brothers for an accounting by a third brother, in which he is charged with defrauding plaintiffs through the manipulations of certain corporations, evidence *held*, to show that defendant paid in the same amount as did plaintiffs to form a corporation to acquire real estate for subdivision and sale, and therefore he was entitled to the same amount of stock as they received.

2. SAME—DIRECTOR PAYING IN NO MONEY NOT ENTITLED TO STOCK.
    Where the evidence shows that another corporation which defendant formed to take over certain real estate was financed by others, and that he did not pay in any money, he is not entitled to retain any shares of stock therein.

3. SAME—DIRECTOR NOT CHARGEABLE WITH DISCOUNTS ALLOWED ACCORDING TO ESTABLISHED CUSTOM.
    Where the evidence was sufficient to establish a custom of allowing discounts to purchasers of lots paying up before their contracts were due, the trial judge properly declined to charge defendant with the amounts so allowed by him.

4. SAME—EQUITY—DIRECTOR PERSONALLY PURCHASING CLAIM
   AGAINST CORPORATION ADVANTAGEOUSLY HELD TO PURCHASE FOR
   CORPORATION.

> Where a corporation in which defendant and his brothers were
> directors was owing large sums in deferred commissions on
> sales to another corporation which had gone into bankruptcy,
> and defendant told them it would be necessary to resort to
> bribery to advantageously purchase said claim, which they
> declined to do, purchase of it by defendant personally at a
> sum far below its face value, is *held*, under the circumstances,
> to have been purchased for the company, since he owed a duty
> to the company to adjust said claim on terms advantageous
> to it.

Appeal from Wayne; Webster (Arthur), J. Submitted October 10, 1928. (Docket No. 10, Calendar No. 33,306.) Decided January 7, 1929.

Separate suits by the Wabunga Land Company, the St. Cosme Land Company, Gustave Schwanbeck against Louis H. Schwanbeck, and Louis H. Schwanbeck against the St. Cosme Land Company and the Wabunga Land Company. The cases were consolidated and heard as one. From the decree rendered, all parties appeal. Modified and affirmed.

*James Swan* (*James O. Murfin*, of counsel), for plaintiffs.

*Chawke & Sloan*, for defendant Louis H. Schwanbeck.

FELLOWS, J. These six cases bring to our attention the unfortunate discord among the three Schwanbeck brothers who for many years were associated together in business and who until the happening of the events here involved had, and rightly had, unbounded confidence in each other. Two of the

cases are chancery cases and four of them are cases on the law side. It was originally stipulated that, for the purpose of bringing to an end all the litigation between the parties, the cases be heard together, the trial judge to make findings in the law cases followed by judgments, and to make decrees in chancery cases, but by a later stipulation the law cases were transferred to the chancery side with agreement that one decree be made in all the cases. After this order was made, the pleadings were not revamped; there was talk about making amendments but none were in fact made. One decree was entered and appeal was taken by both parties. In view of the two stipulations and the spirit of them, we shall treat the pleading as amended so far as may be necessary to present the questions before us.

Louis H. Schwanbeck is charged with defrauding his brothers through the manipulations of the corporations named. He will be styled defendant, and the others will be styled plaintiffs. There were literally thousands of items involved in the lawsuits. Some of them were adjusted on the advice of counsel before the hearing, in many the results reached in the trial court are accepted. Defendant's counsel aptly and properly states the issues and the sole issues here involved. They say in their brief:

"The sole issues on appeal are:

"(1) The plaintiff contends that the decree so far as it concerns the St. Cosme Land Company stock adjustment is erroneous. The defendant contends likewise.

"(2) The plaintiff contends that the Wabunga stock adjustment was erroneous. The defendant contends it was correct.

"(3) The plaintiff contends that the allowance by the court of the general commission account was

erroneous. The defendant contends that the court was correct.

"(4) The defendant, in addition, contends that the decree was erroneous also in taking from the defendant the Merchant's deferred commission account, which he purchased with his own funds from the defunct Merchant Company."

We shall state, and need only to state, the facts necessary to decision of these four questions. Preliminary to taking up the detail, we should make plain that both corporations were practically family affairs, there were but few stockholders outside the brothers and their relatives, and outside of the brothers there are no stockholders here complaining. This litigation is purely a family affair.

1. *St. Cosme Land Company.* This corporation was organized to acquire real estate for subdivision and sale; it was not to do that work itself; that was to be done by the Merchant Company, a real estate broker. The shares were of the par value of $100, and there were issued to Gus and Will, brothers of defendant, 100 shares each, to a nephew of defendant 20 shares, to his brother-in-law 10 shares, to the attorney organizing the company 1 share for qualifying purposes, and to defendant 170 shares. There were also issued to outsiders, 135 shares. Defendant insists he is lawfully entitled to 171 shares, having paid for that number, and plaintiffs insist he is entitled to none. The trial judge found he was entitled to 100 shares. It seems to be admitted that the land involved was to be purchased by defendant at $1,250 per acre and turned into the corporation at $1,300, and the promotion fee thus obtained was to be divided between the members of the family. The circumstances of its incorporation are these: Defendant's attention was called to some acreage in Ecorse township suitable for subdivision purposes. The

Merchant Company was anxious to plat and sell it, but apparently was not in financial condition to take it over, but a Mr. McCollum who was connected with that company offered to and did put in the deal $5,500. August and Anna Keppen owned 56.86 acres, and this was first acquired; afterwards 31.55 acres were acquired from Henry Keppen, and 7.5 acres from William Aben. The pieces were each platted and were named Elmwood Park, 1, 2, and 3. The question to be solved is how much, if any, cash was put into this corporation by defendant. A reading and a re-reading of defendant's testimony satisfies us that the trial judge, who saw and heard him testify correctly concluded that but little credence should be given his testimony. The record is satisfying that he was not a truthful witness. But decree should not pass against him for this reason alone. Laying aside the conflict between the testimony of the parties and taking only the mathematics based on the undisputed facts, the conclusion is irresistible that defendant put into the deal the same amount each of his brothers did and no more.

Part payment was made on each of the purchases, deeds were executed to the company, and mortgages for the balance were given. The mathematics show that the cash payments were as follows: On the first piece $24,537.50 (there is a little dispute as to the correctness of this figure, but it does not affect the result), on the second piece $13,437.50, and on the third piece $3,875, making a total cash expenditure of $41,850. There is no question but that this amount was paid out in cash. There was received from the outside stockholders the following sums: A. J. Monnier, $3,000, J. L. Liggett, $5,000, Cecil McCollum, $5,500. There is a dispute as to the amount Gus and Will put in, but the difference is inconse-

quential. For practical purposes, one set of figures is as good as the other. We take one of the sets of figures; it shows the following sums paid: by Gus $8,674, by Will $8,674, by Louis H. II (nephew) $1,734.80, by Gibbings (brother-in-law) $867.40, making a total paid in by the persons named of $33,450.20. As stated, there was paid out $41,850, demonstrating almost to a mathematical certainty that defendant paid in over $8,000—that he paid in the same amount as did his brothers and was entitled to the same amount of stock as they received. The company then needed no more money, the Merchant Company was to the expense of platting and selling the property, and soon commenced to pay money into the St. Cosme Company. Defendant's claim that he then advanced something over $4,000 to buy bonds to put into the treasury of the company is not convincing. This portion of the decree will be affirmed.

2. *Wabunga Land Company.* Near the St. Cosme piece of land was approximately 100 acres of land owned by Mrs. Eberts. The Merchant Company had an option to purchase it at $1,000 per acre, on which it had paid $8,500; there was $11,500 due the next day. The Merchant Company, as we shall presently see, was hard pressed, and could not raise the money. Its officers approached defendant to finance a company to take over the Eberts farm, and agreed to repurchase it at $1,350 per acre, and agreed that $5,000 of the amount already paid Mrs. Eberts might be applied on such agreement. Defendant hurriedly organized the Wabunga Land Company. John L. Liggett put in $5,000, and defendant borrowed $10,000 from a trust company, and this, with the Merchant Company's $5,000, swung the deal. Defendant wrote to his brother Gus, then in California,

a letter which admittedly falsely stated the purchase price, terms, and amount he had borrowed and advanced. Gus took $5,000 of this deal, Will took $5,000, and there was issued to Liggett, Gus, and Will 50 shares each, and to defendant 100 shares; he afterwards sold his nephew 10 of these shares. Again the mathematics of the case may be invoked. They demonstrate that, although the defendant borrowed the money to finance the deal, none of his money remained in the company. There was needed to swing the deal $20,000. The Merchant Company furnished $5,000, Gus $5,000, Will $5,000, and Liggett $5,000. Indeed, defendant on cross-examination testified:

"*Q.* I am referring to your brother Gus. He gave you his note?

"*A.* Not that I recall.

"*Q.* You are sure of that, aren't you?

"*A.* Well, I would not be —

"*Q.* All right. At any rate he paid you some day $5,000?

"*A.* Yes, sir.

"*Q.* And your brother Will paid you $5,000?

"*A.* Yes, sir.

"*Q.* And Liggett paid you $5,000?

"*A.* Yes, sir.

"*Q.* And Merchant was allowed $5,000?

"*A.* He was allowed $5,000 on the contract.

"*Q.* You sold ten shares to your nephew for $1,000?

"*A.* Yes, sir.

"*Q.* So when it was all over you had 89 shares, or 90, counting the one of Mr. Swan's, and a thousand dollars, and you had not put in one red sou, had you?

"*A.* I had put in all the money that was required.

"*Q.* That was all paid back to you, wasn't it?

"*A.* Certainly it was all paid back.

"*Q.* So far as any money of your own was con-cerned, for that 89 shares and the thousand dollars from your nephew you haven't paid one red penny?

"*A.* Ultimately it cost me nothing."

Later, however, he came in with explanations of more or less plausibility. The finances of this company were in splendid shape. The trial judge was persuaded that they indicated some payment by defendant, and allowed him to retain 40 shares in this company. But this company, as well as the other company, were successful from the start. The Merchant Company before its failure sold many lots and turned over much cash to both companies. We are unable to find in this record evidence which satisfies us that defendant paid a cent into this company. The decree in this regard must be reversed.

3. *General Commission Account.* This may be a misnomer of what is really involved under this branch of the case. In the main, it involves discounts made to purchasers in different ways, the amount being $19,772.79. It is made up of a myriad of small items. As we have noted, the Merchant Company started off very successfully in the sale of lots in the various subdivisions owned by the St. Cosme Company as well as in its own subdivisions, the title to which rested in the Wabunga Company. But it did not last long. Bankruptcy proceedings put an end to its activity. Many purchasers of lots who had made purchases of the Merchant Company flocked to the office of the two plaintiff companies, then in charge of defendant. He conceived, as he claims, that it would be good business as these companies had, by reason of the Merchant failure, these subdivisions on their hands, to make new contracts with these purchasers, allowing them credits for payments already made to the Merchant Company;

that the amount allowed would be less than they would have to pay new salesmen as commissions to go out and sell the lots to new customers, and that this was done in many, many instances. He also claims that it was customary to give a purchaser a discount if he paid up his contract before it was due by its terms. A large number of witnesses, purchasers in these subdivisions, corroborated these claims. We think the testimony clearly establishes a custom and sustained defendant's claims, although all of the hundreds of purchasers were not called, and that the trial judge was right in declining to charge defendant with this amount.

4. *Deferred Commissions.* In the contract between the St. Cosme Company and the Merchant Company, the agreed commission was 25 per cent., and it was payable out of the payments on the contracts as they came in by taking and retaining one-half of such payments until the commission had been paid in full. There had been a large number of lots recently sold before the adjudication in bankruptcy, and a large sum had been earned as commissions, but which would not be due or payable for some time. It was a valid claim against the St. Cosme Company, but not then due. The trustee in bankruptcy desired to get in all the money he could, and approached defendant. The purchase of this account at a fair figure would be advantageous to the St. Cosme Company, as that company eventually would have to pay it if the contracts were not defaulted. Defendant talked with his brothers about it, but told them that court officers and attorneys would have to be bribed to secure an advantageous purchase of the account. Under such circumstances, they declined to have anything to do with it. It amounted to many thousands of dollars, and he paid $4,000 for it and took it

over personally. He does not claim that he had to bribe anyone, and, in fact, denies he so stated to his brothers. Defendant was then in charge of the affairs of the St. Cosme Company. It is too well settled to need citation of authorities that his duty to that company and its stockholders required him to adjust this claim on terms advantageous to his company. Had he submitted to his brothers, who are also directors in the company, a proposition to honestly purchase or settle this account, and they had declined, another question would have been presented. It fairly well appears that the company had sufficient money on hand, but, if not, it had ample credit. When he told his brothers that bribery had to be resorted to in order to acquire the account at a fair figure, they properly declined to have anything to do with it. He then purchased it for many thousand dollars below its face. Under these circumstances, in equity he purchased it for the company, and the trial judge correctly so held.

Modified as pointed out in (2) of this opinion, the decree will be affirmed. Plaintiffs will have costs of this court.

NORTH, C. J., and FEAD, WIEST, CLARK, McDONALD, POTTER, and SHARPE, JJ., concurred.