MONTAGUE PUNCH v. THE HIPOLITE COMPANY, a Corporation, ET AL., Defendants, HENRY FLARSHEIM ET AL., Appellants, MINETTE K. HILL, Intervenor.

MONTAGUE PUNCH v. THE HIPOLITE COMPANY, a Corporation, ET AL., Defendants, CLARENCE FLARSHEIM ET AL., Appellants, MINETTE K. HILL, Intervenor.

MONTAGUE PUNCH v. THE HIPOLITE COMPANY, a Corporation, ET AL., Defendants, JENNIE C. FLARSHEIM, Executrix of the Estate of MILTON J. FLARSHEIM, ET AL., Appellants, MINETTE K. HILL, Intervenor.

MONTAGUE PUNCH v. THE HIPOLITE COMPANY, a Corporation, ET AL., Defendants, AUGUST E. GILSTER ET AL., Appellants, MINETTE K. HILL, Intervenor.—100 S. W. (2d) 878.

Division One, December 14, 1936.

*Lewis, Rice, Tucker, Allen & Chubb, Milton H. Tucker, Robert T. Burch, Salkey & Jones, Wilbur B. Jones* and *Fred A. Eppenberger* for appellants.

56

*Dubinsky & Duggan* for respondents.

58

FERGUSON, C.—The Hipolite Company is a Missouri corporation, incorporated in 1913, with 2000 shares of common stock, of the par value of $100 per share, issued and outstanding. The company is, and has been continuously since its organization, engaged in the manufacture and sale of "a marshmallow cream" under the copyrighted, and nationally advertised, name of "Hip-O-Lite." The office and factory is in St. Louis. In 1926 the Boatmen's Bank of St. Louis was the owner of 1089 shares of the Hipolite Company stock and held unsecured notes of the Hipolite Company for money loaned that company in the principal sum of $90,250. We shall hereafter detail the facts which gave rise to this situation and the sale of the 1089 shares of stock and these notes to certain of the defendants herein. In April, 1926, two of the directors of The Hipolite Company, defendants Milton J. Flarsheim and Roland R. Reinholdt, and defendants August E. Gilster, Henry Flarsheim and Clarence Flarsheim, who were strangers to and in no way connected with the corporation, by an arrangement among themselves, hereafter stated, purchased the 1089 shares of stock and the $90,250 in notes from the Boatmen's Bank for $40,000. A proportionate number of the 1089 shares of stock were duly transferred to each according to his contribution to the $40,000 purchase fund. They caused the notes for $90,250 to be transferred to defendant J. Sydney Salkey who held them as their trustee. Shortly thereafter Gilster was elected a director and Milton J. Flarsheim was elected vice president and made general manager of the company. Payments were made by the company from time to time on the interest and principal of the notes held by Salkey as trustee from 1926 to September, 1930, when this suit was filed, as the earnings of the company would permit. In this manner interest in the amount of $27,247.58 was paid and $28,500 paid on principal leaving $61,750 unpaid balance on principal. In November, 1927, the plaintiff, Punch, acquired and became the owner of sixty-three shares of stock. In February, 1930, Roland R. Reinholdt sold and

transferred all his stock holdings in the company and his interest in the notes held by Salkey as trustee to Milton J. Flarsheim and terminated his connection with the company. On September 18, 1930, plaintiff, Punch, filed this suit in equity in the Circuit Court of the City of St. Louis making The Hipolite Company, Roland R. Reinholdt, Henry Flarsheim, Clarence Flarsheim, and J. Sydney Salkey, trustee, and all of the then members of the board of directors of The Hipolite Company, George A. Buse, Milton J. Flarsheim, Mack K. Paskal, August E. Gilster, Edwin J. Ernst and G. A. Metz, defendants.

The bill takes a wide range, charges insolvency and mismanagement and attacks the transaction whereby Gilster, Reinholdt and the three Flarsheims acquired the stock and notes from the Boatmen's Bank. The relief sought is, "that a Receiver be appointed to take charge of the assets" of the corporation; that the officers and directors of the corporation be removed and "be permanently enjoined from acting as such;" that Gilster, Reinholdt, Milton J., Henry, and Clarence Flarsheim and Salkey, trustee, "be ordered and directed . . . to pay The Hipolite Company all money heretofore paid by" the company to Salkey as trustee on the notes held by him and that the company and defendant directors "be restrained from making any further payment" thereon to Salkey as such trustee; and that Gilster, Reinholdt and the three Flarsheims "be ordered and directed to transfer, surrender and deliver to The Hipolite Company, the respective number of shares of stock which they received on the division of the 1089 shares of stock" received by them from the Boatmen's Bank. On January 13, 1931, Minnette K. Hill, the owner of fifty shares of the Hipolite Company stock, which she had acquired by gift in 1929, filed an intervening petition with substantially the same allegations made in plaintiff's bill and praying the same relief. Trial of the cause, in the Circuit Court of the City of St. Louis, was concluded on April 10, 1931, and "the cause taken under advisement by the court." While the cause was under submission the defendant Milton J. Flarsheim died and the cause was revived against Jennie C. Flarsheim, the executrix of his estate, who entered her appearance. On April 4, 1932, the court entered this judgment: "Finding and decree for defendants. Plaintiff's petition denied and dismissed. Intervening petition denied and dismissed." Plaintiff and Intervenor timely filed separate motions for a new trial. While these motions were under submission, and on May 31, 1932, during the same term at which the above judgment in favor of defendants was entered, the court, "of its own motion," set aside and vacated that judgment and entered a new decree and judgment. By this decree the court entered judgment respectively against Gilster, Henry Flarsheim, Clarence Flarsheim and the estate of Milton J. Flarsheim in the proportionate amount each had shared in the total paid to Salkey,

trustee, on the notes in excess of $40,000 and interest thereon from April, 1926, the date they had purchased the stock and notes from the Boatmen's Bank. Judgment was also entered against Salkey, trustee, for these several proportionate amounts. The decree then orders Salkey, trustee, to "immediately deliver" the notes held by him to The Hipolite Company "for cancellation and that The Hipolite Company immediately upon receiving said notes . . . cancel and destroy same so that all the liability on said notes by said Hipolite Company be forever barred and extinguished." The decree specifically denies the prayer of plaintiff and intervenor that Gilster and the Flarsheims be required to transfer and surrender to the company the 1089 shares of stock which they acquired in the transaction with the Boatmen's Bank; specifically denies the application for the appointment of a receiver for The Hipolite Company and generally denies "all other prayers for relief . . . not specifically granted." The decree further adjudges "that the plaintiff and intervenor take nothing . . . against the defendants George A. Buse, Mack K. Paskal, Edwin J. Ernst and G. A. Metz (four of the six members of the Board of Directors). Neither plaintiff nor intervenor appealed from the judgment but a separate appeal therefrom was taken by each of the defendants, supra, against whom judgment went. The five separate appeals are docketed here as follows: Henry Flarsheim, No. 32,944; Clarence Flarsheim, No. 32,945; Jennie C. Flarsheim, executrix of the estate of Milton J. Flarsheim, No. 32,496; August E. Gilster, No. 32,947; and J. Sydney Salkey, trustee, No. 32,948. In this connection we again observe "that separate or cross-appeals in the same case do not make separate cases in the appellate court. There is properly only one case in the appellate court." [Walsh v. Southwestern Bell Telephone Co., 331 Mo. 118, 52 S. W. (2d) 839, 841; Ruehling v. Pickwick-Greyhound Lines, 337 Mo. 196, 85 S. W. (2d) 602, and cases there cited.]

Much of the evidence in the case related more directly to issues which were determined by that part of the decree denying certain relief sought and neither plaintiff nor intervenor appealed. The issue remaining is whether Gilster, Reinholdt and the three Flarsheims having, with their own funds, purchased the notes of The Hipolite Company to the Boatmen's Bank at a discount should be permitted to enforce collection in the full amount thereof against the company. The trial chancellor's final conclusion, as we have noted, was, in effect, that they should be held to have acted as trustees for the company in the transaction and that they were entitled to collect from the company only the amount, $40,000, which they paid, with interest thereon, and should refund to the company all sums collected in excess of that amount and surrender the notes for cancellation. There is but little material conflict in the evidence bearing on this issue so that the chancellor's decree can hardly be said to be based upon a finding

made from conflicting oral testimony. Being an equity suit and considered *de novo* on appeal we find ourselves in a position to review the case on established facts.

The Hipolite Company was organized in 1913 by W. H. Hipolite and 2000 shares of common stock of the par value of $100 each were issued. For some y,ears the company prospered and its business rapidly increased. It paid large dividends and engaged in an extensive campaign of national advertising in magazines having a wide circulation expending a total of approximately $500,000 for that class of advertising up to 1922 when expenditures for that purpose were curtailed as will be later noted. Sometime during this most prosperous period of the company's history W. H. Hipolite sold 900 shares of stock. Later he purchased this block of 900 shares of stock for approximately $100,000. At that time he borrowed $63,000 from the Boatmen's Bank on his personal note secured by the 900 shares of stock. From time to time for some years prior to 1922 the corporation had borrowed various large sums of money from the Boatmen's Bank upon notes of the corporation to the bank endorsed by W. H. Hipolite but without other security. It is undisputed that these notes constituted a valid, bona fide indebtedness of the corporation. The proceeds went into the business and apparently were principally expended in maintaining and carrying on the extensive campaign of magazine advertising. By 1922 these loans aggregated approximately $100,000. It is explained that certain cumulative economic and trade conditions arose which seriously affected this type of business and the company sustained and continued to have heavy annual losses until by 1922 the situation had become such that W. H. Hipolite was unable to meet his personal obligations or to obtain the financial aid required for the continued operation of the company. He then made an offer to the Boatmen's Bank, which it accepted, to surrender and transfer to the bank all of his interest in the 900 shares of Hipolite Company stock, which it held as collateral for his personal note, and transfer to the bank 189 additional shares of stock owned by members of his family and sever his connection with the company upon condition that the bank release him from liability on his personal note to it for $63,000 and also from liability on his endorsement of the company's notes to the bank. Pursuant to the bank's acceptance of the offer Hipolite procured the additional 189 shares of stock held by members of his family and transferred same, together with the 900 shares held by the bank as security for his $63,000 note, a total of 1089 shares of stock, to the bank; Hipolite's personal note for $63,000 was canceled and the bank also released him from liability on his endorsement of the then approximately $100,000 in notes of the corporation to it for money loaned the corporation. In this manner the bank became the absolute owner of 1089 shares of stock of the corporation out of 2000 shares issued. It also held unsecured

notes of the corporation approximating the aggregate $100,000. Following this transaction Sears Lehmann, the bank's attorney, and A. B. Goodbar, an employee of the bank "in charge of its liquidations," were elected directors of The Hipolite Company. Goodbar was also elected vice president and general manager of the company and took over the active management thereof. The hope, never however realized, was that such economies in operation could be inaugurated and the business so conducted that it would produce a profit instead of a loss, which had now continued over an extended period of years, and the indebtedness to the bank liquidated. Goodbar did greatly reduce expenses as for example while $25,000 had been spent in 1922 for magazine advertising that item was reduced to $3000 in 1923 and the yearly office and factory expense was reduced approximately $12,000. Though drastic reductions in the expense of operation were made and losses greatly reduced the business nevertheless failed to show a profit and the losses continued. Not only were no payments made to the bank on the principal of the company's notes but it became necessary to call on the bank, from time to time, for further advancements to keep the business going until by 1926 the principal sum of the indebtedness to the bank, represented by the notes of the company, increased from $100,000, at which it stood when the bank took over the controlling stock interest in 1922, to $123,000. About this time the bank had the company convey to it a "piece of real estate," which the company owned, at a valuation of $32,750 and credit in that amount was entered upon the company's notes reducing the principal thereof to $90,250 at which it remained. As the writer recalls this real estate was not property used in connection with the business of the company. Thus after four years of operation of the company the bank held its unsecured notes in the principal sum of $90,250 representing an undisputed, valid and bona fide indebtedness of The Hipolite Company. Goodbar testified: "The Boatmen's Bank wanted their money. I was in there (as manager of The Hipolite Company) in an effort to pull the business up to the point where they could pay their debts, at least the Boatmen's Bank. The bank was pressing the company for money. They impressed upon me frequently that they were anxious to get out of the marshmallow business; that is to say, to find somebody who would buy their interest in it if we could. They were particularly anxious to do so . . . because they were preparing to nationalize the bank from a state bank to a national bank and wanted to clean the sheet as far as possible. I made considerable effort to interest parties in the proposition." Sears Lehmann, attorney for the bank and placed by the bank upon the board of directors of The Hipolite Company testified: "The bank wanted to sell the business and get out and the only person I knew in the food business was F. W. Chamberlain & Company. I tried to get them to buy it and Mr. Chamberlain and Mr. Silver, the sales-

manager there, went over it, and they told us to get out. They didn't like it. They wouldn't touch it. We knew we were stuck. We couldn't demand payment (the notes were demand notes) because we couldn't get it. We were trying to get out. We knew we were not able to collect . . . We (the bank) figured that we were going no further. When we started in 1922 the company owed us about $100,000. We had the majority of the stock. We never could sell that. In the four years between 1922 and 1926 the bank's debt went up about $20,000 ($23,000). In other words we were about $20,000 worse off in 1926. We checked it up and I decided—when we checked over the stockholders—that it would be practically impossible that we would be allowed to sell that company out without a receivership, and our experience with receiverships, my own and the banks, has been very disastrous. We figured that at a forced sale and a quick liquidation, which we were determined upon, the bank would net less than $40,000.''

In his effort to find a buyer for the bank's interest in The Hipolite Company and enable it to close the transaction and get out of the business Goodbar went, late in 1925, to defendant August E. Gilster, president of the General Grocery Company, and sought to interest him in the purchase of the bank's interest in the company. The General Grocery Company is one of the largest wholesale organizations in the middle west engaged in the sale of food products. Gilster was not a stockholder in The Hipolite Company nor connected in any way with that company. Gilster went to the office of the Hipolite Company examined its books and inspected its plant and then took the matter up with his associates in the General Grocery Company but could not interest them in it. He next took the matter up with other friends, the president of Nugent's, the president of a coffee company and his brother. They had several meetings and canvassed the situation and the possibilities of The Hipolite Company and finally concluded to offer the bank $30,000 for the $90,250 of Hipolite Company notes and the 1089 shares of stock of that company.

The offer was made but refused by the bank and as that group would not increase the offer the negotiations were terminated. The defendant, Milton J. Flarsheim was connected with the Seavey and Flarsheim Brokerage Company, which sold food products, and was manager of the St. Louis office of the company. Prior to 1922 he invested $10,000 in the stock of The Hipolite Company and was owner of 100 shares of The Hipolite stock. In 1922 he was elected a director of The Hipolite Company and continued in that office until his death in 1931 while this cause was under submission in the circuit court. Roland R. Reinholdt purchased 100 shares of The Hipolite Company stock in 1919 and in the same year was elected a director and secretary and treasurer of the company which offices he continuously thereafter held until February, 1930, when he sold

and transferred all of his interest in the company to Milton J. Flarsheim and terminated his connection with the company. Milton J. Flarsheim learned of Goodbar's negotiations with Gilster. He later discussed the situation with Gilster and learned that the offer made by Gilster and his friends had been refused by the bank and that they were apparently not interested in pursuing the matter further. Milton J. Flarsheim and Gilster further discussed the matter and Reinholdt became interested. Milton J. Flarsheim's brothers, Clarence of St. Joseph, Missouri, and Henry of Kansas City, Missouri, neither of whom was, or had ever been, a stockholder in or in any way connected with the Hipolite Company, were consulted. These five men joined in an offer to pay the Boatmen's Bank $40,000 for its 1089 share of stock and the $90,250 in notes of The Hipolite Company. This offer the bank accepted. In this connection the bank's attorney, Lehmann testified: ''We figured that at a forced sale and quick liquidation (of The Hipolite Company), which we were determined upon, the bank would net less than $40,000 on what it had in that business. Therefore we sold it for $40,000.'' The five men making the purchase contributed to the $40,000 fund as follows: Gilster, $15,000; Clarence Flarsheim, $7500; Henry Flarsheim, $7500; Reinholdt, $5000; and Milton J. Flarsheim, $5000. The transaction was closed in April, 1926. The 1089 shares of stock were transferred to these five men, the allotment to each being in proportion to his contribution to the purchase fund as follows: Gilster, 408 3/8 shares, Milton J. Flarsheim, 136 1/8 shares, Reinholdt, 136 1/8 shares, Henry Flarsheim, 204 3/8 shares and Clarence Flarsheim, 204 shares. The notes however were in such amounts they could not be divided among the five purchasers. An arrangement was made whereby defendant J. Sydney Salkey, who so far as appears was in no way connected with either The Hipolite Company or the bank, took and held the notes as trustee and issued to each of the five purchasers a declaration or certificate of trust which, he testified, ''certified that I was holding the notes as trustee, in which, we will say Henry Flarsheim, if the certificate was given to him, had an undivided 3/16 interest. I gave each of the men a separate declaration of trust as evidence of beneficial ownership of a certain interest in the notes. . . . They did not want to issue new notes to the individuals'' whereby it would be possible for one to ''press the notes when they came due to the disadvantage of others who had contributed. They were not going to have one man sick of his bargain in thirty days and sue the company on its notes while the other men were content to wait for gradual liquidation.''

The membership of the board of directors of The Hipolite Company was fixed at seven. It will be recalled that two of the five men who made this purchase, Milton J. Flarsheim and Reinholdt were directors, the other three had no prior connection whatsoever with

the company. Shortly after the transaction Gilster was elected a director. The bank's interest in the company having terminated Goodbar's connection as vice president and general manager ceased and Milton J. Flarsheim was elected vice president and made general manager in which position he continued until his death. While he took over the duties of active management of The Hipolite Company he continued in his employment with the Seavey and Flarsheim Brokerage Company. It is apparent that Gilster's and Milton J. Flarsheim's knowledge of and experience and contacts in the sale of food products and in that type of business was of great value to The Hipolite Company. From April, 1926, to the time this suit was filed. in September, 1930, and continuing to the time of trial, in April, 1931, the company seems to have been most competently and efficiently managed. Sales were increased, profit was substituted for losses, large items carried as assets but having no real or substantial value were charged off and the company put upon a sound basis; its bills were discounted; the interest on the notes held by Salkey, trustee, was kept paid and the principal thereof reduced to $61,750 and these things were accomplished during a period of great business and industrial depression. After a trial extending over three days during which much evidence was adduced relative to the management of the business from and after the time the five men, who were referred to at times as the syndicate, purchased the controlling stock interest, the trial chancellor declared: "I think the directors have conducted this business in a very efficacious manner since 1926."

Plaintiff Punch is an attorney in St. Louis. He testified that he acquired the sixty-three shares of stock the "latter part of 1927" from a client as a fee. Intervenor Hill received her fifty shares of stock in 1929 as a gift from her father. He testified, that he became the owner of the fifty shares of stock in 1923; that he acquired them in a trade; that he owned some stock in a mine in Arizona; that the mine became "extinct, it is busted;" that he "gave $600 in cash and some" of this mining stock for the fifty shares of Hipolite Company stock; and that no dividends had been paid on the Hipolite stock. As stated, in February, 1930, Reinholdt sold and transferred to Milton J. Flarsheim all his stock holdings in The Hipolite Company, 236 1/8 shares, being 136 1/8 shares of his proportionate part of the stock purchased from the Boatmen's Bank and the 100 shares which he owned prior thereto, and all his interest in the unpaid balance of The Hipolite Company notes held by Salkey as trustee. At that time Reinholdt ceased to be a director and to the time this suit was filed the vacancy on the board of directors thus occasioned had not been filled so that at the time of the filing of this suit there were six members of the board, but two of whom, Gilster and Milton J. Flarsheim, were members of the group of five who purchased the stock and notes from the bank. Edwin J. Ernst a director succeeded

Reinholdt as secretary and treasurer when Reinholdt left the company in February, 1930. The company's books show the transfer in April, 1926, of the 1089 shares of stock from the Boatmen's Bank to the five members of the purchasing group according to their proportionate interest therein. A notation was made upon the entry in the books of the company relating to the Boatmen's Bank notes showing that the notes were held by J. Sydney Salkey, trustee, but the names of the beneficial owners were not shown. The payments both on principal and interest were made to J. Sydney Salkey, trustee.

The trial chancellor's final conclusion as evidenced by the last decree was that the owners of the beneficial interest in the notes should be limited in their claim against the company thereon to $40,000 with interest from April, 1926, and that each member of the syndicate should refund to the company all amounts received by him in excess of the proportionate amount contributed by him to the $40,000 purchase fund and interest thereon. This was computed and it was found that to the time he sold and transferred his beneficial interest in the notes to Milton J. Flarsheim, Reinholdt had received approximately $5000 the amount of his contribution to the $40,000 fund with interest thereon so no judgment of refund was entered as to him. On this theory judgment went against the other four members of the purchasing syndicate as follows: Gilster, $2783.20; Henry Flarsheim, $1391.60; Clarence Flarsheim, $1391.60; and the estate of Milton J. Flarsheim, $1855.47.

Appellants first contend that the petitions do not state, nor the proof show, facts giving rise to a cause of action in the individual stockholder and that the petitions should therefore be dismissed. "It is well settled that the right to sue for breaches of trust by directors of a corporation, resulting in injury or loss to the stockholders" or the corporation is "primarily in the corporation." [Bulkley v. The Big Muddy Iron Co., 77 Mo. 105.] Plaintiff and intervenor brought this suit as individual stockholders. The gist of the case they argue is that by reason of the fact Milton J. Flarsheim and Reinholdt were directors of The Hipolite Company at the time and Gilster became a director shortly following the consummation of the transaction between the syndicate of five men and the bank that in equity these five men who joined in the purchase from the bank should be held to be mere trustees for the corporation in the transaction and the corporation entitled to any profits or benefits resulting therefrom.

The cause of action claimed accrued primarily to the corporation and not to the stockholders. "The stockholders would not be authorized to prosecute such action until they first exhausted all remedies within the corporation, unless the facts were such that it would be futile for them to make any effort to obtain relief through corporate channels." [Caldwell v. Eubanks, 326 Mo. 185, 30 S. W.

(2d) 976; Vogeler v. Punch, 205 Mo. 558, 103 S. W. 1001; Kirrane v. Boone, 334 Mo. 558, 66 S. W. (2d) 861.] In order therefore to maintain the action the individual stockholder must allege, and the proof show either, that he has made demand upon the board of directors to take remedial action on behalf of the corporation and that effort failing that he unsuccessfully sought action by the stockholders as a body, or a state of facts from which it appears that such demand or effort within the corporation and through corporate channels would have been futile and unavailing. [Caldwell v. Eubanks, supra, and cases there cited.] ■ Respondents say that the objection now made to their right to maintain the action was not specifically made either by demurrer or answer and was therefore waived and cannot now be raised in this court. No separate demurrer was filed. Demurrers to the petitions on the ground that the petitions do "not state facts sufficient to constitute a cause of action against defendants" were incorporated in the answers and the answers, or returns as the parties designate them, then proceed at length and specifically to meet the allegations of the petitions. The demurrer was never ruled but we need not discuss the matter of a demurrer further as the allegations of the petitions are such as to make them immune to a demurrer. Plaintiff and intervenor alleged facts which, if taken as true upon a demurrer, show a clear right in them as stockholders to maintain the action. But as we view the evidence the proof does not sustain the allegations of the petitions in this respect. It is not enough to allege facts which, if taken as true, show the right to maintain the action but the proof must also show such facts. While the answer proper does not specifically challenge plaintiff's right to maintain the action or make specific objection thereto that part of the answer in the nature of a general denial puts the facts alleged in the petition as giving rise to a right in the plaintiff to maintain the suit in issue. However "the matter was such as was not waived by failing to make specific objection either by demurrer or answer" and the general denial contained in the answer "was sufficient to raise the issue of fact" and require plaintiff and intervenor "to prove the existence of such facts as would show them entitled to maintain the suit." [Gruender v. Frank, 267 Mo. 713, 186 S. W. 1004.]

We look then to the facts in evidence bearing on this question and the reasonable inferences that may be drawn therefrom. After Reinholdt retired from the company in February, 1930, upon the sale and transfer of his entire stock holdings to Milton J. Flarsheim the vacancy thus caused on the board of directors was not filled and the active membership of the board of directors continued at six. Therefore but two of these six directors, Gilster and Milton J. Flarsheim, were members of the syndicate which purchased the notes and stock from the bank and had a beneficial interest in the notes held by

Salkey, trustee. The other four directors were in no way, nor at any time, connected with the transaction. After the purchase of stock from Reinholdt in February, 1930, Milton J. Flarsheim owned 472 2/8 shares of stock and Gilster 408 3/8 shares, the two directors owning 880 5/8 shares out of 2000 shares of stock outstanding. But the relief sought on account of the purchase and collection of the notes was against all the members of the syndicate making the purchase. From February, 1930, when Reinholdt terminated this connection with the company, to the filing of this suit in September, 1930, the four remaining members of the syndicate, Gilster and the three Flarsheims owned a majority of 1289 shares of stock. Such situation, we think, affords sufficient reason for not applying to the corporation at a meeting of its shareholders for action to redress the wrongs complained of. It is a reasonable inference that such an application would have been a vain and useless undertaking. [Caldwell v. Eubanks, supra; Virginia Passenger & Power Company v. Fisher, 104 Va. 121, 49 S. E. 995; Decatur Mineral Land Co. v. Palm, 113 Ala. 531, 21 So. 315.] This however in itself did not relieve or excuse plaintiff and intervenor from applying to the directors for action. We have pointed out that but two of the six active directors were connected with the transaction complained of. There is no evidence tending to show, nor is it claimed, that the other four directors, or either of them, derived any benefit, or profited in any way, from the transaction or that they, or either of them, were related by blood, marriage or such joint or close business association to the members of the syndicate, or either of them, as to justify the conclusion they would refuse to do their duty as directors. The inference is rather that these four directors did not know, until the filing of this suit, that Gilster and the three Flarsheims owned the beneficial interest in the Boatmen's Bank notes. Only one of the four was called as a witness. Plaintiff and intervenor called director Ernst, who was elected secretary and treasurer in February, 1930, upon retirement of Reinholdt from those offices. He testified that while the books of the company showed the notes, as originally entered, as notes to the Boatmen's Bank, an entry had been made thereon showing Salkey, trustee, as payee and that payments on the notes were made to Salkey, trustee, but that he did not know until the suit was filed, and that was the first information he had thereof, that Gilster and the three Flarsheims were the beneficial owners of the notes or that they and Reinholdt had acquired the notes at the time they acquired the stock. In fact plaintiff and intervenor stress this testimony in arguing their theory of "secret profits" and argue that the evidence warrants the inference that the members of the syndicate purchasing the notes concealed their acquisition and ownership thereof from the other directors and stockholders. We can hardly hold that under such facts the plaintiff

and intervenor as stockholders were not required to first disclose the alleged grievance to the board of directors and demand action by the corporation, that is, first exhaust ''the remedies within the corporation.'' If alone for the purpose of weighing this question we treat the two directors Gilster and Milton J. Flarsheim as guilty of a breach of trust or receiving or collecting secret profits to the disadvantage of the corporation we find no substantial evidence from which it might be inferred that the other four directors would not upon disclosure and demand for remedial action have performed their duty in the premises. The fact urged that the two directors connected with the transaction involved and their two associates therein owned a majority of the stock and could by reason thereof elect the directors does not in itself raise a presumption that these four directors would have refused to order a suit brought in behalf of the corporation to redress an alleged wrong, enforce its rights and protect its interests or would have conducted such suit collusively. Indeed the presumption is rather that they would have discharged their trust faithfully. They were stockholders and in the absence of causes which might likely have influenced them otherwise the presumption is they would have done their duty. ''The presumption is greatly strengthened when the effect of the duty would be to promote their own interest.'' [Virginia Passenger & Power Co. v. Fisher, supra; Baillie v. Columbia Gold Mining Co., 86 Ore. 1, 166 Pac. 965; Decatur Mineral & Land Co. v. Palm, supra; and cases cited in Caldwell v. Eubanks, supra.] As plaintiff and intervenor did not either first make a demand upon or application to the corporation or relieve themselves of the necessity for doing so by showing a condition or state of facts from which it could be reasonably inferred such demand would have been futile they have not satisfactorily shown a right to maintain this action.

Apparently plaintiff and intervenor, and the trial court, were of the opinion that the mere showing that the two directors, Gilster and Milton J. Flarsheim and their associates in the transaction with the Boatmen's Bank owned a majority of the stock of the corporation sufficed to relieve plaintiff and intervenor from first making application to the corporation for remedial action. As pointed out such showing does suffice to excuse application to a meeting of the shareholders but under this evidence would not relieve their failure to appeal to the directors. This record is voluminous, lengthy briefs were filed, a multitude of cases cited, which we have examined, and extended arguments presented, on the merits. We have examined and considered the case on the merits and assuming, in order that the case may be finally determined, that plaintiff and intervenor could show facts which would enable them to maintain the suit we are constrained to now rule the whole case, it being our view that even under

such circumstances no case was made out against appellants on the merits.

Directors and other officers, "while not trustees in the technical sense in which that term is used, occupy a fiduciary relation to the corporation and to the stockholders as a body." [3 Fletcher Cyclopedia, Corporations, p. 142.] One theory of this suit seems to be that as Milton J. Flarsheim and Reinholdt were directors of the Hipolite Company at the time they joined with Gilster and Henry and Clarence Flarsheim in purchasing the stock and notes, and that as Gilster thereafter became a director, that the purchase of the notes at a discount and the subsequent attempt to collect them in full from the corporation constituted a breach of trust or a violation of duty by Milton J. Flarsheim, Reinholdt and Gilster which inhered in and tainted the whole transaction from its inception to the time of the filing of this suit and that all the members of the syndicate should be required to account to the corporation. It should be remembered that the notes to and held by the Boatmen's Bank represented an unquestioned, valid and bona fide indebtedness of the corporation. No claim is made, or was ever made, that the corporation had any defense, off-set or counterclaim against the notes. They were demand notes. The corporation had no funds to apply upon them. After four years of control and management of the corporation the bank had determined upon forced liquidation. The equity of the stockholders was practically valueless. In order to "get out of the marshmallow business," stop the mounting indebtedness, clear up this item in its preparation to "nationalize" and avoid the delay of forced liquidation the bank placed a sale price of $40,000 on the stock and notes. The corporation could not buy them. It did not have either the money, means or credit for doing so. Three strangers to the corporation and two of the directors contributed to the $40,000 purchase fund as we have related. They invested or "risked" their own funds in notes upon which no cash payment had, so far as this record shows, ever been made and in stock of a corporation which had been operating at a loss for more than six years. No element of fraud appears anywhere in the entire transaction. Their good faith is not questioned. It was a business risk which other experienced business men, after examination of the situation, refused to "touch." The knowledge, experience and connections of Gilster and Milton J. Flarsheim in the sale and distribution of food products enabled the corporation, under Milton J. Flarsheim's direct management, to continue as a going concern, get on a sound basis, increase its business, discount its bills, earn a profit instead of operating with continued losses, make a substantial reduction of this indebtedness and greatly enhance the value of the shareholders equity. Had the new management not succeeded and had the business continued as it had for several years past the whole investment would

have likely been lost. Gilster, Clarence and Henry Flarsheim, entire strangers to the corporation, neither having had any prior connection whatsoever therewith, contributed ⅝ of the $40,000 fund.

The general rule seems to be that directors or other corporate officers may purchase outstanding obligations of the corporation at a discount and collect the full value thereof from the corporation unless (1) he owed a present duty to the corporation to purchase or discharge the claim for the corporation or (2) the rights of other creditors of the corporation are involved and the question arises between such director or officer and other creditors. In such case he will not be permitted to collect the full value of such claim to the prejudice or disadvantage of other creditors but will be limited to the amount paid therefor. The matter may be more succinctly stated in this way: a director or other officer of a corporation may rightfully purchase a bona fide outstanding claim against the corporation at a discount and collect in full from the corporation provided he is under no present duty to act in the transaction for the corporation and the rights of other creditors are not involved and prejudiced thereby. [1 Morawitz on Private Corporations (2 Ed.), sec. 521; 2 Thompson on Corporations (3 Ed.), secs. 1343 and 1344; 3 Fletcher Cyclopedia, Corporations, sec. 869; 14A C. J., p. 134; McIntyre v. Ajax Mining Co., 28 Utah, 162, 77 Pac. 613; St. Louis, Ft. Scott & Wichita Railroad Co. v. Chenault, 36 Kan. 51, 12 Pac. 303; Seymour v. Spring Forest Cemetery Assn., 144 N. Y. 333, 39 N. E. 365.] Here the rights of other creditors are in no way involved, no issue of that kind arises and this case cannot be brought within that exception. So far as appears these notes now represent the only, and all of the, outstanding indebtedness of the corporation. The evidence is that under the present management the current expenses of operation were kept paid, that the discount was taken on all bills subject to discount and that the business was operated as a going concern without further borrowing being required. Therefore cases cited by respondents coming within this exception are not in point under the facts of this case. Nor were the two directors, Milton J. Flarsheim and Reinholdt, who joined with three strangers to the corporation in purchasing the corporation's notes at a discount, in view of the existing conditions and circumstances, under a present duty to purchase the notes for the corporation or to pay off and discharge the indebtedness for the corporation. If a corporation has funds with which the purchase could be made or an outstanding obligation discharged, or even perhaps if such funds are reasonably available through proper action of the directors, and a director of the corporation finds that outstanding obligations of the corporation can be purchased or discharged at a large discount such director may be said to then be under a duty to the corporation to afford it the opportunity to make the purchase, or discharge the obligations, with corporate

funds, that is, the duty is upon such officer of the corporation to afford the corporation the opportunity to act in the premises and make the purchase with corporate funds, but if in such situation the corporation officer disregards the interest of the corporation and purchases at a discount, with his own funds, for his own benefit, he will be limited in his recovery against the corporation to the amount which he paid for such obligations. No comparable situation exists in the instant case. We have related the existing conditions and clearly neither Milton J. Flarsheim nor Reinholdt as directors were under any such present duty as the law contemplates to purchase the notes for the corporation. Certainly Gilster, and Clarence and Henry Flarsheim, were under no duty whatsoever to the corporation.

Young et al. v. Columbia Land & Investment Co., 53 Ore. 438, 99 Pac. 936, and 101 Pac. 212, and similar cases cited by respondents are not in point here. In the Young case the holder of certain notes of the corporation offered them to the company at a discount. "The company was well able to take advantage of this offer." However two of the directors personally purchased the notes at the discount offered "for their individual advantage" "notwithstanding it was their duty to use their best endeavor to advance the interests of the corporation" and then sought to collect the full amount of the notes from the corporation. Their recovery was limited to the amount paid for the notes. The first ground of the motion for rehearing was: "Plaintiffs were not disqualified from purchasing the notes in their individual capacity." The opinion on the motion for rehearing (53 Ore. 438, 101 Pac. 212) says: "As to the first proposition (stated, supra), we have no controversy with counsel as to the law. . . . As stated in Cook on Corporations, section 660: 'Directors may buy corporate bonds from third parties at a discount and enforce them at par, where there are no special equities against such purchase, and no present duty in regard to them from him as a director.'" The opinion then again points out that the corporation was "well able" to take up the notes at the discount offered; that plaintiffs were directors at the time of the transaction; that the other directors "connived and consented to the purchase;" that "there was a present duty devolving upon plaintiffs to take up said notes in the interest of the corporation and consequently they are precluded from purchasing at a discount for their own benefit;" and that the case "therefore comes within the exception to the rule that a director may purchase at a discount for his own benefit." Nor are the fraud cases cited by appellant applicable under the facts of this case. [Wabunga Land Co. v. Schwanbeck, 245 Mich. 505, 222 N. W. 707, illustrates such cases.] Three Schwanbeck brothers were the stockholders and directors of the St. Cosme Company, a corporation. Louis Schwanbeck "was in charge of the affairs of the St. Cosme Company." The company was indebted to another corporation which had been ad-

judicated a bankrupt. The trustee in bankruptcy entered into negotiations with Louis Schwanbeck for the sale or discharge of the claims against the St. Cosme Company at a large discount. Louis Schwanbeck "talked with his brothers," the other directors, about the matter but falsely and fraudulently represented to them that to obtain the claim at a discount "court officers and attorneys would have to be bribed. Under such circumstances they declined to have anything to do with it." Without bribery he then individually purchased the claim at a large discount. It was shown the corporation could have purchased the claim and would have done so but for Louis Schwanbeck's fraudulent representations. He was held to account to the corporation. The rule or principle of law that requires directors, officers or agents to account to the corporation for secret profits is invoked by respondents citing numerous cases arising out of varying facts, dissimilar however to the facts of the instant case, in which the rule has been enforced. A typical case is Malden & Melrose Gas Light Co. v. Chandler, 209 Mass. 354, 95 N. E. 791, an officer and agent of the corporation was appointed and authorized to purchase certain property for the corporation. He purchased it in his own name for a less price than he represented to the corporation that he paid and at which he resold to it. He was required to account to the corporation for the difference. We do not deem it necessary however to discuss that well settled doctrine for under the facts of this case we do not perceive its applicability here.

We have heretofore set out the general rule relating to the purchase by an officer or director of claims against the corporation, at a discount, and the exceptions thereto and have applied it to the facts. The applicable principles of law are there stated and are controlling. Our conclusion is that the first judgment entered by the trial chancellor was correct. The judgment therefore must be reversed and and the cause remanded with directions to dismiss plaintiff's petition and the intervenor's petition. It is so ordered. *Hyde* and *Bradley,* *CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Collet,* *J.,* not sitting.