# WILLIAM GUST, Appellant, v. AMELIA HOPPE.

### Division One, February 22, 1907.

1. **FRAUDULENT CONVEYANCE: Purpose to Defraud: Valuable Consideration.** If the purpose of the grantor in selling her property for a fresh consideration was to put it out of the reach of the execution that would follow an apprehended judgment, then it was a fraudulent transaction on her part; and if the buyer made the purchase with a knowledge of this fraudulent purpose of the seller and with the intent to assist in the accomplishment of that purpose, although the buyer at the time paid to the seller what the property was worth, it was a fraudulent transaction on the part of both, and the sale should be set aside.

2. ——: ——: **Existing Debt: Fresh Consideration.** A distinction is to be observed between one who purchases for a fresh consideration and one who purchases merely to secure a pre-existing debt. An insolvent debtor may make a preference of creditors, and if a creditor takes property from him for the sole purpose of liquidating or securing the debt, mere knowledge on his part that the effect of the conveyance will be to defeat other creditors and knowledge that the debtor is making the conveyance for that purpose, will not render the deed void. But one who is not a creditor, who has no existing interest to preserve or protect, who purchases merely for a fresh consideration, is not protected in his purchase if he knows that the seller is selling for the purpose of putting his property out of the reach of creditors.

Appeal from Gasconade Circuit Court.—*Hon. William A. Davidson,* Judge.

REVERSED AND REMANDED *(with directions).*

*Robert Walker* for appellant.

Plaintiff brings this suit as purchaser of real property sold under general execution against a judgment debtor. The law is well settled in our State that such purchaser may bring suit to set aside fraudulent conveyance made of such property by the judgment debtor, prior to the execution sale; and that he occupies as ad-

vantageous a position as would the judgment creditor, when proceeding to set aside the debtor's conveyance on the ground of fraud. Bradshaw v. Halpin, 180 Mo. 666; Woodward v. Mastin, 106 Mo. 324; Rinehart v. Long, 95 Mo. 396; Ryland v. Callison, 54 Mo. 513. It is undisputed that Hermine Gust, the judgment debtor, collected and converted all her property into cash money, and that, to use her own words, she "had the money in her pocket," and refused to pay the judgment debt, recovered against her on account of moneys not belonging to her, and kept by her as against the owner, a deaf sister. The presumption of fraud on her part is very violent, if not absolute, in the light of her own words in court. 14 Am. and Eng. Ency. Law, 522; Renney v. Williams, 89 Mo. 139; Leavitt v. La Force, 71 Mo. 353; Bump, Fraud. Conv., secs. 47, 612; Powell v. Canady, 95 Mo. App. 713; Dunivan v. Dunivan, 157 Mo. 157.

*Breuer & Hensley* for respondent.

(1) Deference is always accorded the findings and judgment of the trial court, and especially where the witnesses were present and testified orally. Arn v. Arn, 81 Mo. App. 133; Short v. Taylor, 137 Mo. 517; Dunivan v. Dunivan, 157 Mo. 157; Cox v. Cox, 91 Mo. 71. (2) Fraud and collusion must be proved, and will not be assumed by the court by mere obscurity or apparent fraud, and if a transaction consists as well with honest and fair dealing as with a fraudulent purpose, it should be referred to the better motive. Briant v. Jackson, 99 Mo. 596; Robinson v. Dryden, 118 Mo. 534; New England Loan and T. Co. v. Browne, 177 Mo. 412; Bank v. Worthington, 145 Mo. 91. And in this case the facts as disclosed by the evidence show the transaction to be a fair and honest deal. (3) Courts of chancery place little reliance upon testimony proving loose conversations or statements, when used to over-

throw a legal title.   Cornet v. Bertelsmann, 61 Mo. 118; Fanning v. Doan, 139 Mo. 392.   (4)   The burden of proof is upon appellant to prove the charges in the petition that Hermine Gust conveyed said real estate with the intent to defraud, hinder and delay her creditor, Albertine Bode, and that respondent, Amelia Hoppe, not only knew of such fraudulent intent when she purchased said real estate, but participated therein, and that said conveyance was voluntary and without any consideration.   Bank v. Worthington, 145 Mo. 91; Albert v. Besel, 88 Mo. 150; Wall v. Beedy, 161 Mo. 625; State ex rel. v. Hope, 102 Mo. 410.

VALLIANT, P. J.—Plaintiff purchased the real estate in question, which is a house and lot in the village of Morrison, Gasconade county, at a sheriff's sale under a general execution on a judgment in favor of Albertine Bode against Hermine Gust, and brings this suit in equity to set aside a deed to the same property executed by Hermine Gust to the defendant Amelia Hoppe, on the ground that the deed was without consideration and made for the purpose of hindering and defrauding Albertine Bode in the collection of her debt.

This is a family quarrel; William Gust the plaintiff, Charles Gust, Hermine Gust, Albertine Bode and Amelia  Hoppe, the defendant, were brothers and sisters.

October 20, 1902, Albertine Bode brought suit against Hermine Gust, and on 13th December, 1902, obtained judgment for $825.30; execution on that judgment issued and under it the real estate in question was sold by the sheriff and purchased by the plaintiff, William Gust, May 11, 1903, for the sum of $500.   That is the plaintiff's title.

November 6, 1902, while the above-mentioned suit was pending, Hermine Gust executed a deed convey-

ing the property to Amelia Hoppe, the defendant, for the consideration expressed of $1,000. That is the defendant's title.

The evidence on both sides shows the following facts:

These are German people, well on in years, all being 60 years or over, of good common education and fair intelligence. Before the occurrence of the business transactions in controversy the plaintiff, William Gust, Albertine Bode and Hermine Gust lived together in this house which was the property of Hermine. While they were so living together William had in his possession a sum of money, something over $800, belonging to Albertine, which by her consent he passed to Hermine. Albertine is now dead and we have not her testimony in the record. There is a dispute between the parties as to whether this transaction was a loan of the $800 to Hermine to be repaid to Albertine, or was a payment to Hermine for her care and keeping of Albertine. It appears in the evidence that Albertine was deaf, but there is no proof that she was otherwise afflicted or incapable of taking care of herself. While they were thus living together a very hostile feeling grew up between them, that is, with William and Albertine on the one side, and Hermine on the other, the result of which was William and Albertine moved away and Albertine brought the suit above mentioned against Hermine to recover the $800 in dispute and, as already said, recovered judgment for the same. In her answer to that suit Hermine set up a counterclaim for $485.25, of which $435 was for board and nursing; the jury allowed her $68. The bitter feeling above mentioned was quite manifest on both sides in the taking of the testimony in this case. The feeling between Hermine, Charles and Amelia, the defendant, was friendly, and these latter two were witnesses for Hermine.

In addition to the above undisputed facts the testi-

mony on the part of the plaintiff tended to prove as follows:

Hermine had loaned her brother Charles $1,000, of which Albertine's $800 above mentioned formed a part, and held his note for the same. In August, 1902, a few days after Albertine had moved away, Hermine called in this loan and Charles paid it to her. After the judgment in favor of Albertine had been rendered and an execution had been returned unsatisfied, Hermine was called into court under the terms of section 3227, Revised Statutes 1899, and examined touching her ability and means to pay the judgment and in such examination she testified that she had the money she had collected from Charles: "Q. What has become of that money? A. I have it; it is in my pocket; it is nobody's business."

When Albertine was packing her chattels, in getting ready to move away from Hermine's house and go with William, the three sisters being present, some angry words passed between them on the subject of Albertine's money which Hermine had, and in the quarrel Amelia, the defendant, said to Albertine, "If you stay with us, you will get your money; but if you go with Bill you will get not one red cent."

Amelia was also heard on another occasion to say that Hermine had collected the money from Charles so that no one could touch it, and that she, Amelia, had bought the house so that Hermine would not have it in her name and the lawyers could not get it. Both Amelia and Hermine as witnesses denied that either ever made such a statement.

On the part of defendant the testimony tended to show as follows:

The quarrel between William and Hermine arose out of the fact that he contributed nothing to the support of the household and wanted her to keep him for nothing. While he was there she had to borrow

money to get along, she borrowed $300 from her sister Amelia, and gave her her note for the same. According to Hermine's testimony the $300 note was given for borrowed money, but according to Amelia it was for vegetables, poultry, etc., furnished. After William left he threatened to burn the house down, and that fact and also because Hermine was old and afflicted with rheumatism and could not live alone in the house and also because she owed her sister Amelia $300 were the reasons that induced her to sell.

The contract to sell was in writing, dated August 25, 1902, at which time defendant paid $500 and surrendered to Hermine her note for $300, and she paid the remainder of the purchase money, $200, in October following; the deed was not executed until November 6th, because at the time defendant made the last payment Hermine was sick. After the purchase by defendant, her husband sold the house and premises in which they had formerly lived and they took up their abode in the house she purchased from Hermine, the house in question, and have lived there ever since, Hermine living with them. The property was not worth more than the price defendant paid for it. Defendant testified that she knew nothing of any purpose on the part of Hermine to defraud Albertine.

The chancellor found the issues for the defendant and rendered judgment accordingly, from which judgment the plaintiff has appealed.

There is no noticeable difference between the opinions of the counsel as to the law of this case. The real question in the case is one of fact.

If the purpose of Hermine Gust in selling the property was to put it out of the reach of the execution that would follow the judgment she apprehended Albertine Bode would recover, then it was a fraudulent transaction on the part of the seller, and if the defendant, Amelia Hoppe, the buyer, made the purchase

with a knowledge of the fraudulent purpose on the part
of the seller and with the intent to assist in the accom-
plishment of that purpose, then it was a fraudulent
transaction on the part of both and the sale should
be set aside. [Wise v. Wimer, 23 Mo. 237; Hender-
son v. Henderson, 55 Mo. 534; Dougherty v. Cooper, 77
Mo. 528; Hurley v. Taylor, 78 Mo. 238; Sexton v. An-
derson, 95 Mo. 373; Wall v. Beedy, 161 Mo. 625.]

We are well satisfied that the purpose of Hermine
was to defeat the collection of the impending judgment
and it is difficult to see how Amelia, the defendant, could
have failed to know it. Hermine's testimony showed
that she was a woman of strong feelings and that she
was very inimical to her brother William and her sis-
ter Albertine. After they had quarreled and separated,
and she had cause to think that she might be called
to account for the $800 which was a subject of contro-
versy between them, she made this contract of sale and
she called in the $1,000 loan she had made to her brother
Charles, and after the judgment had been rendered
and the first execution thereon had been returned *nulla
bona*, and she had been called into court for examina-
tion touching her ability to pay, she flaunted the fact
that she had the money in her pocket then and there,
and she volunteered to imply that the attorney's in-
quiry was impertinent; her language was, "I have it;
it is my money, and it is nobody's business — I have
got it in my pocket." Her attitude was defiant, and
one can scarcely read her testimony without concluding
that she not only was determined to defeat the collec-
tion of the judgment, but also that she had fortified
herself with legal advice as to how to accomplish that
purpose. It is altogether improbable that one with
her limited legal education would have felt the security
she manifested when, in the presence of the court, she
told the inquiring attorney that she had the money in
her pocket and it was none of his business, unless she

had had legal advice as to the immunity of her person in such case.

It was August 12, 1902, when Albertine packed up her chattels and left Hermine's house. It was August 25, 1902, when Hermine collected the $1,000 she had loaned her brother Charles, and on that day also she made the contract of sale of the house and lot to her sister, the defendant Amelia. Amelia was there when Albertine was packing to leave, she denies that she told her that if she left she would not get a cent of her money, but admits that she was present and assisted her in packing her things. But considering her intimacy with her two sisters and the open hostility between the latter, it is more reasonable to infer that she knew, than that she did not know, the cause of the hostility and the purpose of Hermine in collecting the outstanding loan from Charles and selling the house and lot. We find, therefore, from the evidence that she knew those facts and that she bought the house in full view of the consequences that would result to Albertine if the sale should be held to be valid.

Did she make the purchase for the purpose of aiding Hermine in her purpose?

In transactions of this kind there is a distinction drawn between one who purchases for a fresh consideration and one who purchases merely to secure a preexisting debt. Our law allows an insolvent debtor to make a preference of creditors; therefore, if a creditor takes property from his insolvent debtor for the sole purpose of liquidating or securing the debt, mere knowledge on the part of the favored creditor that the effect of the conveyance will be to defeat other creditors and knowledge that the debtor in making the conveyance does so for that purpose will not render the deed invalid in the hands of the favored creditor. But one who is not a creditor, who has no existing interest to preserve or protect, who purchases merely for a fresh

consideration, is not protected in his purchase if he knows that the seller is selling for the purpose of putting his property out of the reach of execution. [Sexton v. Anderson, 95 Mo. 373; Wall v. Beedy, 161 Mo. 625.] Was the defendant in making this purchase aiming only to secure the debt that was due her or was she a mere purchaser for a mere consideration? Her testimony tends to show that her sister Hermine owed her $300. She testified that she asked Hermine for the money and the latter replied that she would sell her the house and the sale resulted from that proposal.

Charles Gust was a witness for defendant. He was called to prove that he witnessed the payment by defendant to Hermine of some money for the purchase of the house and lot, and he so testified. It was he who had owed his sister Hermine the $1,000, of which she had demanded payment at or about the same time that she was selling the property to defendant, and he paid it. Hermine was gathering in all of hers that was outstanding and at the same time selling the only tangible property that stood in her name. On cross-examination of this witness, Charles, he stated that when Hermine asked him to pay the $1,000 note he did not have the money, but borrowed it, paid it to Hermine and took up his note, and on further cross-examination he said he borrowed the money from Hermann Hoppe, the defendant's husband. Thus we have the act of the defendant's husband which enabled Hermine to get the $1,000 out of reach, and the act of the defendant herself which, if sustained, puts the house and lot beyond the length of the law's arm. It is very improbable that defendant's husband would have advanced the $1,000 to Charles to be paid to Hermine under the circumstances and at that particular time, if the defendant had felt any anxiety about the collection of her $300 note. If the collection of that note had

been an object of serious desire it would have been easy for the defendant's husband to have turned it in as cash in that transaction.

We are reluctant to reach the conclusion (courts ought to be reluctant to place the stamp of fraud on a transaction if there is a plausible air of fairness about it), but nevertheless we have reached the conclusion, that the purchase of this house and lot was a part of a fraudulent conspiracy on the part of these members of the family to defeat their sister Albertine in her effort to collect her debt, and that defendant entered into the scheme not merely to secure the $300 debt which she claims was due her but to aid Hermine to accomplish her purpose.

The judgment is reversed and the cause remanded to the circuit court with directions to enter judgment cancelling the deed from Hermine Gust to Amelia Hoppe dated November 6, 1902, recorded in the office of the recorder of deeds of Gasconade county in Book 24, page 568, purporting to convey the real estate described in the petition.

All concur, except *Woodson, J.,* not sitting.