Yellow Manufacturing Acceptance Corporation, a Corporation, Appellant, v. American Taxicabs, Inc., a Corporation, William J. Brown, Ruth Maloney, Elizabeth J. Denton, Robert O. Cathcart, Joseph R. Cathcart and Agnes Cathcart.—130 S. W. (2d) 601.

Division One, July 7, 1939.

*Thompson, Mitchell, Thompson & Young, Richmond C. Coburn, R. Forder Buckley* and *H. L. Harvey* for appellant.

1204

*Wilbur C. Schwartz* and *Irl B. Rosenblum* for respondents.

HYDE, C.—This is an action in equity, under Sections 4959, 4960, and 4961, Revised Statutes 1929, seeking an accounting from the directors of the American Taxicabs, a corporation, and a judgment against these directors for money and property of the corporation which they are alleged to have acquired, transferred, lost or wasted. Appointment of a receiver, injunction, and other equitable relief was sought, and plaintiff also asked for judgment for $43,725.56 against American Taxicabs. After hearing the evidence, which was all produced by plaintiff but included the testimony of some of defendants put on the stand by plaintiff, the trial court dismissed plaintiff's bill. Plaintiff has appealed from the judgment of dismissal.

Defendants' first contention is that plaintiff, not being a judgment creditor, cannot maintain this suit, which was "brought on behalf of plaintiff and other creditors (of American Taxicabs) who are situated as is plaintiff." Sections 4959-60-61, Revised Statutes 1929, provides an equitable remedy against directors personally in cases of mismanagement (4959), which may be aided by a receivership (4960), and which may be brought by "any creditor" (4961). This is not the same kind of action as a creditor's bill to satisfy claims out of the debtor's equitable estate, not subject to execution, or to reach property fraudulently conveyed by the debtor. [See Coleman v. Hagey, 252 Mo. 102, 158 S. W. 829.] Generally such an action will not lie unless the plaintiff's claim has been reduced to judgment (unless that is impossible) or is definitely admitted both as to liability and amount. [Coleman v. Hagey, supra; Bewes, Inc. v. Buster, 341 Mo. 578, 108 S. W. (2d) 66; Buckley v. Maupin, 344 Mo. 193, 125 S. W. (2d) 820.] This statutory action, against the directors personally, has as its basis the principle that they occupy a fiduciary relationship to the corporation which they manage, and to some extent to those interested therein, and are in a broad sense trustees.

[Hill v. Gould, 129 Mo. 106, 30 S. W. 181; Grand Amusement Co. v. Palladium Amusement Co., 315 Mo. 907, 287 S. W. 438; Bromschwig v. Carthage Marble & White Lime Co., 334 Mo. 319, 66 S. W. (2d) 889; see, also, The Legal Status of Corporate Directors, Uhlman, 19 Boston U. Law Rev. 12, 5 Current Legal Thought 263.] The words "any creditor" in Section 4961 unquestionably mean more than "any judgment creditor" and they have been construed (as used in this and other similar statutes) to include a simple contract creditor. [Hutson v. Long Bell Lbr. Co., 1 Fed. Supp. 468, l. c. 474; Mackenzie Oil Co. v. Omar Oil & Gas Co. (Del.), 120 Atl. 852; Jones v. Mutual Fidelity Co. (C. C. A.), 123 Fed. 506; see, also, Pusey & Jones Co. v. Hanssen, 261 U. S. 491, 43 Sup. Ct. 454, 67 L. Ed. 763.] As pointed out in the Mackenzie Oil Company case, no such statute was necessary to aid judgment creditors in the collection of their claims. We, therefore, hold that a contract creditor is entitled to bring suit for the limited purposes authorized by these statutes. [As to scope of this action see State ex rel. Kansas City Missouri River Nav. Co. v. Dew, 312 Mo. 300, 279 S. W. 65; Hornig v. Jones (Mo. App.), 252 S. W. 981; Shafer v. Home Trading Co., 227 Mo. App. 347, 52 S. W. (2d) 462; Glover v. St. Louis Mutual Bond Inv. Co., 138 Mo. 408, 40 S. W. 110.]

Defendants further contend that, even if the statutory action is available to a simple contract creditor, still plaintiff cannot maintain it because plaintiff was not a creditor of any kind at the commencement of this suit. Defendants' answer specifically admitted the first eleven paragraphs of plaintiff's petition, except paragraph nine, alleging plaintiff's assignment, as to which they averred lack of knowledge. The admitted facts, therefore, are that during 1929, 1930 and 1931 American Taxicabs purchased a large number of yellow cabs from General Motors Truck Company, securing purchase price payments by chattel mortgages thereon; that on May 12, 1934, it executed a chattel mortgage to plaintiff, as assignee of the Truck Company, covering 191 cabs, to secure the balance due on its indebtedness for all former purchases with payments (required weekly and which the mortgagor agreed to pay) modified in amount and extended; and that the amount due from it to plaintiff on May 12, 1934, was $74,065.96.

Paragraph twelve of the petition stated that total payments made thereafter amounted to $2500, that plaintiff obtained possession of the cars by replevin, after default, on December 8, 1934; that, upon foreclosure by public sales on December 21 and 22, the cars were sold to the Truck Company for $30,250; and that the balance remaining due to plaintiff on the latter date was $43,725.56. Defendants denied generally the allegations of paragraph twelve but further stated:

"That plaintiff is not a creditor of the corporate defendant in that the sale of the taxicabs mentioned in paragraph 12 of plaintiff's

petition was not a fair sale; that said taxicabs were sold to the General Motors Truck Company; that the said General Motors Truck Company and plaintiff are both wholly owned subsidiaries of the Yellow Truck & Coach Manufacturing Company and that all of said three corporations are in truth and fact operated and controlled by the same board of directors and management; that the price alleged to have been obtained for said taxicabs, to-wit, $30,250.00, was grossly inadequate and unfair in that the said taxicabs sold, or purported to have been sold as set forth in said paragraph 12, were at the time of said sale of the then reasonable value of $75,000.00.''

It thus appears that defendants admit the creation of the debt due from American Taxicabs to plaintiff, and its existence on May 12, 1934, and that they make no claim of any payments thereon, more than plaintiff alleged, prior to the foreclosure, so that conceded facts show the default. Moreover, defendant Ruth Maloney, Secretary of American Taxicabs, when called as a witness produced its books which showed a balance of $72,500 due plaintiff on December 8, 1934, when the cars were replevined. These books also showed a credit entered in March, 1935 (after this suit was commenced) ''of the proceeds of the foreclosure sale of $30,000.00'' showing ''the American Taxicabs owed the Yellow Manufacturing Acceptance Corporation as of that date $42,500.00,'' and that ''this is the last entry on the account.'' It was also admitted by defendants' counsel during the trial that ''pursuant to the terms of the chattel mortgages already offered in evidence that there were two sales of the cabs, and that at those sales the General Motors Truck Company bought the cabs in and paid Yellow Manufacturing Acceptance Corporation, the plaintiff in this case, the sum of $30,000, for which the American Taxicabs was given credit.'' Thus, by pleading and evidence (documentary and oral) the total amount of plaintiff's claim, prior to foreclosure, is admitted; and the only claim made to deny the status of plaintiff as a creditor is that the cars were sold at foreclosure for 40% of their reasonable value. This is not even a sufficient allegation of inadequate foreclosure price to state a case for setting aside the sale (which was not asked) on the sole ground of inadequacy of price. [See Knoop v. Kelsey, 121 Mo. 642, 26 S. W. 683; Schwarz v. Kellogg (Mo.), 243 S. W. 179; Webb v. Salisbury, 327 Mo. 1123, 39 S. W. (2d) 1045; Judah v. Pitts, 333 Mo. 301, 62 S. W. (2d) 715; Masonic Home v. Windsor, 338 Mo. 877, 92 S. W. (2d) 713.] Defendants alleged no other grounds for setting aside the sale or for its invalidity and did not ask any affirmative relief of any kind. [For discussion of who may purchase at foreclosure sale, see 4 Missouri Law Review, 186.] Certain circumstances might make the equitable remedy of redemption applicable (See Pueblo Real Estate, Loan & Inv. Co. v. Johnson, 342 Mo. 991, 119 S. W. (2d) 274) but the record herein leaves no doubt as to the inability of the corporate defendant to re-

deem because of its hopeless insolvency, and it sought no such relief. Nevertheless, so long as defendants chose to let this sale stand (without allegations of sufficient grounds for challenging it), we must, for the purpose of determining whether plaintiff is an actual creditor, consider it as valid and that they are bound by its result. [Uhrig v. Hill-Behan Lbr. Co., 341 Mo. 851, 110 S. W. (2d) 412; Peterson v. Kansas City Life Ins. Co., 339 Mo. 700, 98 S. W. (2d) 770, 108 A. L. R. 583; Waltner v. Smith (Mo. App.), 274 S. W. 526.] Therefore, while defendants stated the conclusion that plaintiff was not a creditor, the facts specifically stated or admitted (upon which this conclusion is based) are susceptible of only one construction; namely, that plaintiff was an unpaid contract creditor. We hold plaintiff's status as a contract creditor of American Taxicabs to be established by the facts admitted by the pleadings, and also by the proof.

■ Before considering the merits, we note that defendants have filed and additional abstract. Plaintiff has filed a motion to strike this additional abstract on the grounds that it was not served within the time required by our Rule 11, and that it is argumentative and states conclusions of the abstractor instead of being confused to setting out parts of the record. This motion is sustained.

■ The acts charged against defendants as officers and directors of American Taxicabs, because of which plaintiff here claims to be entitled to the statutory relief provided against them, were, as follows:

First: That the individual defendants, on December 26, 1934, caused to be incorporated a new company called the Mound City Cab Company; that the incorporation of the new company was in furtherance of a fraudulent conspiracy to defraud creditors that all these defendants (except Ruth Maloney) were related by blood or marriage; and that they dominated and controlled the new company, which received the "assets so transferred to it with full knowledge and notice of the fraudulent nature of said transfer."

Second: That these defendants "fraudulently conveyed or transferred (either directly, or indirectly and by subterfuge) to said Mound City Cab Company said valuable yellow color scheme and said name 'Yellow Cabs', together with the good will attendant thereon; that said last mentioned defendants, acting in the capacity and manner aforesaid, at said time further fraudulently assigned and transferred to said Mound City Cab Company certain contracts under which defendant American Taxicabs, Inc., maintained its exclusive stand privileges at the Union Station in St. Louis, Missouri, at the hotels as above referred to, and elsewhere; that said last mentioned defendants at said time fraudulently transferred or caused to be transferred to said Mound City Cab Company the said valuable and easily remembered telephone number, FOrest 1234, which has been associated in the minds of public of this vicinity with 'Yellow

Cabs', and with the good will of defendant American Taxicabs, Inc.; that the said last mentioned defendants at said time fraudulently assigned to said Mound City Cab Company the leasehold interests of defendant American Taxicabs, Inc., in and to the buildings occupied by it; and that all of said conveniences, assignments and transfers were and are without adequate consideration, and constitute a wasting and dissipation of the assets of defendant American Taxicabs.''

Third: That these defendants ''are about to convey, without adequate consideration, the remaining assets of defendant American Taxicabs, Inc., and further to waste and dissipate the assets of defendant American Taxicabs, Inc., in fraud of the rights and interest of said corporation and of the plaintiff as creditor, and of all creditors of said corporation similarly situated.''

We find that the following facts were shown by the evidence offered in support of these charges. Defendant William J. Brown had been engaged in the taxicab business in St. Louis for many years prior to 1934. From 1917 to 1924, he operated the Brown Cab Company which used cabs brown in color. In 1924, the Brown Cab Company bought the business and equipment of the Yellow Motor Car Company of St. Louis, which used cabs yellow in color. This contract and bill of sale, for the purchase price of $100,000 payable in forty-eight monthly installments, sold and transferred 125 cabs (fifty free from lien), and ''whatever rights the seller has to use the color yellow for its cabs and designs now used.'' The owners of the Yellow Motor Car Company also agreed ''that they will not engage in the taxicab business in either the city or county of St. Louis, Missouri, directly or indirectly, either in person or through any corporation, partnership or other agency at any time within five years.'' It was shown that many of the cabs sold had been damaged in a drivers' strike prior to 1924. The defendant American Taxicabs was incorporated in 1928 to take over Brown's business, but he later became its owner holding all but two shares of its stock. After that time only cabs, yellow in color, were used. American Taxicabs (hereinafter called the ''old company'') got into financial difficulties by 1933. This was due both to the effects of the depression and to a driver's strike during that year. Its statement of June, 1933, showed debts of $164,028.82 and assets of $205,546.01, of which $142,991.14 represented mortgaged cabs. If the value of these cabs was overestimated by one-third, as seems likely from the evidence, then the company was practically insolvent at that time. (Probably its mortgaged meters were also overvalued.) By the end of 1934, its indebtedness was more than $100,000, not including what it owed plaintiff on chattel mortgages, and its cabs (which had constitued the principal part of its assets) had been lost by foreclosure, because it was unable to make its weekly payments to plaintiff. It had a strong competitor in the Black and White Cab Company, and there were other competing companies and independent

drivers. Plaintiff obtained final judgment establishing its right of possession in the replevin suit after the foreclosure sale and after this action was commenced but before the trial herein.

After the replevin suit the old company, in order to hold the taxicab rights at the Union Station and at hotels, continued to operate with five Ford cabs which belonged to defendant R. O. Cathcart. With other persons interested in the business of the old company, Cathcart incorporated and became president of a new company called the Mound City Cab Company, which will be referred to as the New Company. Its articles were executed on December, 24, 1934, and its certificate of incorporation was issued on December 26th. Its capital was $20,000, all of which was paid in and $17,000 was immediately used as a first payment to buy seventy-five new Ford taxicabs, which the New Company put into operation at once together with the five cabs already owned by Cathcart. At the time of the foreclosure, the directors of the Old Company were William J. Brown, who was its president and owned 198 shares of its stock; Elizabeth J. Denton, who was Brown's sister and held one share of stock; and Ruth Maloney, who was its secretary and owned one share of stock. R. O. Cathcart was the night superintendent and his wife, who was a sister of Brown, was the night dispatcher. J. R. Cathcart, a brother of R. O. Cathcart, was day superintendent and claim adjuster. The company's attorney was Wilbur Schwartz. The principal stockholder of the New Company was R. O. Cathcart who put up $5000 of his own money for fifty shares and borrowed $4000 more for forty shares taken in the name of Morton K. Lange, an attorney associated with Wilbur Schwartz. Cathcart borrowed this from one of the officers of the Paragon Oil Company, which sold all oil used by both the Old Company and the New Company. Other incorporators were: Paul Browne, not related to defendant Brown, who was an officer of the Consolidated Petroleum Company, from which both the Old Company and the New Company bought its gasoline, who took fifty shares; C. C. Kaufmann, also an attorney associated with Wilbur Schwartz, who took twenty shares actually paid for by Wilbur Schwartz; James Moran, who was an employee of the American Taxicabs, who paid for ten shares with his own money and who became treasurer of the New Company; and Ruth Maloney, who took thirty shares, the payment for which is one of the matters in controversy and will be hereinafter further discussed. Defendant Brown was employed as general manager of the New Company. Defendant Ruth Maloney was employed as bookkeeper and the Cathcarts continued in the same positions with the New Company as they held with the old, as was also true of Mrs. Denton and James Moran. They were paid the same, or larger salaries, as before. The directors of the New Company were: R. O. Cathcart, Kaufman and Lange. The first meeting of the stockholders, as well as the first meeting of the directors of the New Company, was held on January, 3, 1935.

On December 31, 1934, the New Company made an application to the St. Louis Board of Public Service for a certificate of convenience and necessity for the operation of Yellow Cabs. This was held up because the American Taxicabs already held such a certificate. An agreement was reached between the directors of the Old Company and the directors of the New Company for the sale of the Old Company's interest in the color right and certain other assets for which a bill of sale was executed on January 15, 1935. The purchase price agreed upon was $5000, which was paid $3000 in January, and $2000 in February, out of the gross receipts of the New Company. The bill of sale sold and transferred certain office equipment and certain shop equipment which was described in detail and also "whatever right, title and interest the undersigned has in and to the yellow color heretofore used by it in connection with its business, together with any and all right, title and interest the undersigned may have in and to any or all contracts with hotels, or others, and with the Terminal Railroad Association for keeping and maintaining stands, or stations, or parking facilities for taxicabs; together with the customers list of the said American Taxicabs, Inc., and as incident to the foregoing the good will of the undersigned." After receiving this bill of sale on January 15, 1935, the New Company made another application for a certificate of convenience and necessity, which was granted. The New Company also took over the garage lease of the Old Company at 3320 Pine Street, which it used for its main office. The $5000 thus paid and other cash amounting to about $1300 was all used to pay local creditors of the Old Company. It also retained certain other physical assets of no considerable value, including four old cabs, some parts and replacements for the foreclosed taxicabs, and its accounts receivable, totaling about $1000.

The principal basis of plaintiff's claim is that $5000 was an wholly inadequate price for the assets transferred. There was no evidence to show the value of the contracts with the hotels which required some payments, or the value of the contract with the Terminal Railroad which was a lease of the Station concourse for which $300 per month had to be paid. Neither was there any evidence to show the value of the shop equipment and office equipment transferred, except that it was all old equipment of very small value. No right to transfer a telephone number was recognized by the Telephone Company. The principal asset transferred which plaintiff claims had great value was the color right. Plaintiff's evidence concerning this is not very definite. It was shown that there was no national organization of yellow cabs, so that it appears that its value in each city depends to a considerable extent upon local circumstances and the standing of the company using them.

However, Mr. Prusing, vice-president of plaintiff, testified as follows:

"From my experience both as a man who is selling taxicabs to operators and from using cabs as a customer, in my opinion, the value of the color right of the taxicab is created by the general good will that has been built up in the minds of the riding public through an almost accepted financial responsibility of the cab companies that operated under the yellow color. . . . The yellow color right is particularly appealing to transient fares, as distinguished from domestic fares in the cab business. This is so because it is a nationally advertised color proposition that is known throughout the country. Yellow cabs generally have built up a reputation for responsibility and good will with the public. There is no other color right in the cab business that is used to the same extent nationally as the yellow color is."

He further testified, as to estimating the value of this color right, as follows:

"Q. Now, assuming that the company was insolvent, and assuming, furthermore, that all of its taxicabs were taken away, tell the Court how you would estimate the value of that yellow color right? A. Well, I don't know that I would even attempt to value the color right. Q. No one could tell it? A. I don't know. Q. What would it be worth to the defunct company? A. I don't know. . . . Q. In other cities, like Philadelphia, for example, the Yellow Companies have gone out of business, haven't they? A. I don't know that they have gone out of business. They sold out for two hundred and fifty thousand dollars, and their equipment was of no value at all, so that might give you an idea of the value of the yellow color." (No explanation of the time or details of this transaction was given.)

Mr. Versen, who was president of the Yellow Motor Car Company which sold out to the Brown Company in 1924 for $100,000 testified on this issue as follows:

"As to what the value of the color, as far as the Yellow was concerned, on January 15, 1935, I could only gauge the value of something by something that had preceded it. You know what price was paid for the yellow cabs and color rights in 1924. I would have to accept that as a fairly good criterion of the value later on. I don't know what the value was in 1935 in dollars and cents but it certainly had value. . . . I don't know whether in January, 1935, anybody wanted to pay anything for a color. I would not have paid anything for it because I didn't want to go in the taxicab business again. I don't know anybody that wanted to buy it. I don't know under what conditions the color scheme could have been bought. Perhaps if it had been offered on the market you might have found a buyer for it at a substantial price."

This being an equity case, we consider the evidence in the record *de novo* and are not bound by the chancellor's findings. However,

where as here the charge is bad faith and fraud and the chancellor's findings are based· on oral testimony of witnesses before him, we are inclined to defer to them and usually will do so unless they are·clearly erroneous or not supported by substantial evidence. Here, the chancellor's dismissal judgment stated that he "finds *on the merits* that the relief prayed for . . . be . . . denied." Moreover, the chancellor overruled all objections directed to plaintiff's capacity to maintain the suit and proceeded to hear the evidence on the merits. We will, therefore, consider that the findings were necessarily in favor of defendants as to good faith and lack of fraud, and will determine whether or not they should be sustained under the evidence above stated. ■ Plaintiff argues that the transfer of assets from the Old Company to the New Company is covered with badges of fraud, as follows: Transfer of property in expectation of suit, transfer of substantially all property owned, transfer of property when heav-ily indebted, inadequacy of consideration, fictitious consideration, and transactions between relatives. While such badges of fraud, especial-ly the concurrence of several of them, warrant the inference of fraud (or constitute substantial evidence of fraud), they do not compel such inference and are not conclusive. [Castorina v. Herrmann, 340 Mo. 1026, 104 S. W. (2d) 297; Hendrix v. Goldman (Mo.),.92 S. W. (2d) 733.] We have ruled that a corporation cannot escape liability if it is organized for the purpose of taking over the assets of another corporation without paying any adequate consideration so as to be a mere continuation thereof to escape its debts. [Holley v. Iron Mountain Co., 332 Mo. 1234, 62 S. W. (2d) 740.] The crux of the matter here is adequacy of the consideration. If the $5000 consideration paid was grossly inadequate, it was because of the value of the yellow color right since the other assets transferred were not shown to be of any great value.

■ It appears from the testimony of the only two witnesses who attempted to testify as to the value of the yellow color right, that no estimate of its value, in St. Louis in 1935, could be made by them. Certainly their testimony only leaves the matter in the realm of speculation and conjecture and is too indefinite for a court to make a finding that the $5000 paid was so grossly inadequate as to make the transfer fraudulent. The yellow color and design is no more than a trade name and trade mark, unregistered, but acquiring value as a property right primarily because. of its use in .St. Louis and the reputation of defendants' company and its predecessors in such use, although it is aided by the fact that it is nationally used and by the reputation of similar companies using it elsewhere. [See Yellow Cab Co. v. Sachs (Cal.), 216 Pac. 33, 28 A. L. R. 105.] It is a right that courts of equity will protect by injunction and other appropriate re-lief "on the broad ground of enforcing justice and protecting one in the fruits of his toil;" and upon the more specific grounds of: "(1)

The promotion of honesty and fair dealings. (2) The protection of the purchasing public against fraud. (3) The protection of the plaintiff's property right.'' [Yellow Cab Co. v. Creasman (N. C.), 117 S. E. 787, 28 A. L. R. 109; see, also, notes 28 A. L. R. 114; 17 A. L. R. 787.] It is, however, a right which like good will decreases in value with the depreciation of the owner's reputation and financial standing. In view of plaintiff's indefinite evidence as to value in St. Louis in 1935 and the insolvent condition of the Old Company at that time, we hold that plaintiff failed to make a case of a fraudulently inadequate consideration.

Plaintiff says that part of this consideration was fictitious because almost half of the $5000 was used to pay debts due the Terminal Railroad and the Telephone Company, which the New Company would have been required to pay to hold the Station lease and the telephone number. However, the New Company assumed all future payments on the Union Station lease and these past due accounts were valid debts of the Old Company. It was subject to cancellation by the Terminal upon ninety days notice. It certainly was not conclusively fraudulent to pay them even if this was an indirect benefit to the New Company.

Plaintiff further argues that even though a vendee pays full value for property transferred, still the sale is void if the debtor's purpose was to hinder, delay or defraud his creditors and the vendee purchased with knowledge of such purpose, citing Gust v. Hoppe, 201 Mo. 293, 100 S. W. 34; Farmers Bank v. Handly, 320 Mo. 754, 9 S. W. (2d) 880, and other similar cases. This line of cases has been recently reviewed and broad general statements therein (especially some in Kurtz v. Troll, 175 Mo. 506, 75 S. W. 386) were somewhat limited in Peoples Bank v. Jones, 338 Mo. 1048, 93 S. W. (2d) 903. We do recognize and enforce the rule that where the vendee knows of a fraudulent purpose and aids in its accomplishment by payment of the consideration in such form as to assist the debtor in concealing his assets or otherwise aids him to hinder, delay or defraud his creditors, and with that intent, then the sale (or mortgage) may be set aside as to him because of his participation in the fraud. [Peikert v. Repple 342 Mo. 274, 114 S. W. (2d) 999; Hendrix v. Coleman (Mo.), 92 S. W. (2d) 733; Voelpel v. Wuensche (Mo.), 74 S. W. (2d) 14; Gust v. Hoppe, supra.] However, that rule does not apply where the debtor does not conceal the consideration but uses all of it to pay debts, as here, because, as said in Peoples Bank v. Jones, supra, there is ''no sound reason why an insolvent debtor may not sell his property to a non-creditor purchaser, who purchases with knowledge of the vendor's insolvency but does so in order to enable the vendor to use the purchase price to pay a *bona fide* debt.'' It is to be noted that none of the stockholders of the Old Company (except Ruth Maloney) were stockholders of the New Company; that the

New Company's stockholders put up their own money for their stock; and that none of this money (except that of Ruth Maloney) came directly or indirectly from the Old Company. This is very different from the situation in Holley v. Iron Mountain Company, supra, where nothing was actually paid for the assets transferred and the only consideration was the assumption of the mortgage thereon, which amounted to a voluntary conveyance of the equity. We think that there was a sound basis of evidence, favorable to the defendants on the issue of good faith, to support the findings of the chancellor upholding their transaction.

█ Plaintiff especially emphasizes its argument that the transaction, whereby Ruth Maloney received a $3000 check (dated December 21, 1934) from the Old Company and used it to pay for stock in the New Company, demonstrates the fraudulent purpose and improper acquisition of the Old Company's assets by its directors, charged in plaintiff's petition. Ruth Maloney's testimony as to this transaction was that $1800 of this amount was money due her from the Old Company's taxicab drivers. She said that she made loans to them of from $5 to $25 upon which they paid her 15 cents weekly on each $5 loan. She said that this was all money that she had saved and kept in a savings account in the Easton-Taylor Trust Company. She testified about these transactions as follows: "The men didn't pay me back directly. It was deducted from their pay by the cab company and the cab company would pay me. . . . I kept track of the amount of money I had out with the drivers. I kept track of that in a little card file. That was my own file. I don't have that file any more. When the driver came in I just took his card and tore it up. I didn't keep any permanent record of that. . . . I would give a list to the cashier of the driver and how much, and she would give me the money and we would charge the driver. When I left the money in the company for some little time as I did when they had that strike there with the company, I kept a record of how much the company owed me and I still have that record. . . . My account still shows that they owe me about nine or ten dollars, the drivers. I don't know why I didn't draw out the full amount the company owed me. I just never thought of it. . . . When I drew this three thousand dollar check I just guessed what the company owed me." She produced the book which showed the record of loans to drivers and the payment of these loans charged against them and explained these entries before the trial court. Some of the pages of this book are shown in plaintiff's abstract but the whole book that was before the trial court is not before us. She testified that the company had 300 drivers and that she sometimes had loans to as many as 200 of them at one time.

She explained the remaining $1200, of the $3000 paid to her as follows:

█

"In December, when they took the cabs away, when Mr. Brown was trying to come to some arrangements with General Motors Company, I took $1200 out of my savings account at the Easton-Taylor Trust Company and put it in the American Taxicabs Company. He was trying to get money together to meet some settlement with General Motors. . . . It was in December of 1934. I drew it out of my savings account at the bank. The money was to be used with this understanding—that they could come to an understanding with the General Motors. I put my money in before they found out definitely that they were not going to make any arrangements with the General Motors Company. I took my money out of a good bank and put it into American Taxicabs. The American Taxicabs were always hoping to make a deal with General Motors."

The effect of this testimony depends almost entirely upon the credibility of the witness. The chancellor, before whom this witness (and others) appeared, was better able to determine that matter than we are from the cold record. The books showing the entire record of these transactions were before him (and parts of them are not before us) and he heard the entries explained, asking many questions about them himself. If believed, this evidence showed that this money never was the property of the Old Company but was kept as a special account in the nature of a trust fund for Ruth Maloney to whom it did belong. As such, it stood on a different basis than a debt from a corporation to its director and there is even authority sustaining the right of a corporation to prefer a *bona fide* debt to a director. [See 13 Am. Jur. 1148-1150, secs. 1271-1272 citing Missouri cases.] We hold that a finding of such circumstances would justify the court in refusing a judgment against her for its return to the corporation. While it is possible to draw more than one inference from some of her testimony, and other circumstances, certainly there is not in this record such overwhelming evidence against the chancellor's findings on the issues of fraud as to convince us that they are clearly erroneous. As we said in Moberly v. Watson, 340 Mo. 820, 102 S. W. (2d) 886, while fraud "is most frequently to be deduced from the circumstances surrounding the transaction, and from the acts of the parties," still "mere suspicion is not sufficient," but "the proof must be of such a positive and definite character as to convince the mind of the chancellor." Evidently the chancellor here did not find that the proof herein reached this standard. Since we are not convinced that he was wrong in his view of it, we will follow the usual rule of deference.

Any personal judgment authorized by Section 4959 against the directors of a corporation, for the value of assets lost, wasted, transferred, or acquired by them in violation of their duties, would be an asset of the corporation for the benefit of all creditors or stockholders. [Punch v. Hipolite, 340 Mo. 53, 100 S. W. (2d) 878; Kirrane v. Boone,

334 Mo. 558, 66 S. W. (2d) 861; Craig v. Stacy, 330 Mo. 569, 50 S. W. (2d) 104; Caldwell v. Eubanks, 326 Mo. 185, 30 S. W. (2d) 976, 72 A. L. R. 621.] Therefore, if such a judgment was entered, it would usually be necessary to appoint a receiver to collect it and distribute the proceeds as well as any other assets he might reach. [Glover v. St. Louis Mutual Bond Inv. Co., 138 Mo. 408, 40 S. W. 110.] However, since there was no such judgment in this case, and since the record shows that there were no remaining assets of any considerable value, the court properly refused to appoint a receiver.

 The court also had discretion to dismiss plaintiff's claim for a judgment for the deficiency on the chattel mortgage debt, because this was a claim at law put into plaintiff's petition in equity by amendment during the trial (and not even made a separate count of that petition) and because the court found that no grounds existed for the exercise of its equitable jurisdiction. [C., R. I. & P. Ry. Co. v. State Highway Comm., 322 Mo. 419, 17 S. W. (2d) 535; Ebel v. Roller (Mo. App.), 21 S. W. (2d) 214; Modern Woodmen v. Cummins, 216 Mo. App. 404, 268 S. W. 383; Mansfield v. Monett Bank (Mo. App.), 74 Mo. App. 200; 21 C. J. 142, sec. 123.] Of course, the above cited authorities show that such a dismissal is not *res judicata* of plaintiff's deficiency claim at law, as the court could have allowed an amendment so as to try the legal action as a separate suit.

The judgment is affirmed. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, P. J.,* absent.