LINA JACOBS O'MEARA, APPELLANT, v. NEW YORK LIFE INSURANCE COMPANY, RESPONDENT.—169 S. W. (2d) 116.

Kansas City Court of Appeals. March 1, 1943.

*Lathrop, Crane, Reynolds, Sawyer & Mersereau, Richard S. Righter* and *Rudolph Heitz* for respondent.

*Frank R. Daley, Philip L. Levi* and *David R. Derge* for appellant.

412

BLAND, J.—This is an action on a double indemnity provision of a life insurance policy, issued by the defendant on the life of Thomas L. O'Meara, in favor of the plaintiff, his wife, as beneficiary. The cause was tried as a suit in equity, resulting in a judgment "that plaintiff is not entitled to recover." Plaintiff has appealed.

The face of the policy was for $2500. This amount was paid to the plaintiff by the defendant upon the death of insured, which occurred on the 21st day of May, 1939. Defendant refused to pay under the double indemnity provision, which provided, that defendant would pay "double the face of the policy upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental causes, and that such death occurred within sixty days after sustaining such injury. This Double Indemnity Benefit will not apply if the Insured's death resulted . . . from physical or mental infirmity; or directly or indirectly from illness or disease of any kind."

Plaintiff's evidence tends to show that on and before March 29, 1939, insured was a large robust man, 39 years of age, in good health, except that on said date he was suffering from a chronic cough due to a throat irritation; that he was steadily employed and would engage in such recreational activities as bowling, tennis playing and hunting. Plaintiff's evidence tends to show that the cough was slight, being similar to one caused by excessive smoking. Defendant's evidence is that it was a more serious one.

On the morning of March 29, 1939, plaintiff was unable to start her automobile by reason of the fact that the "battery was dead," and insured attempted to move the car by pushing upon the front of the radiator. The automobile was standing on the driveway adjacent to the residence of the plaintiff and the insured in Kansas City. The ground was covered with sleet and it was slippery. While insured was pushing upon the car he slipped and fell to the pavement of the driveway. Plaintiff, seated in the car, alighted therefrom, and went to where insured was lying on his right side in a doubled up position holding his right side. He was groaning and appeared to be in great pain. Plaintiff assisted him into the house. Insured held his right side, broke out in perspiration and continued moaning while being so assisted. The court refused plaintiff's offer of proof to the effect that insured stated a few seconds after the accident, and at about the time that he entered the house; "That darn fall sure hurt me." This action by the court is assigned, by the plaintiff, as error. Insured remained at his home for about an hour in great pain. He then went to his work, but returned in a few hours and remained at home the rest of the day.

He visited a physician the next morning, who advised him that he was suffering from an inguinal hernia on the right side. Insured began to wear a truss. The truss was uncomfortable but insured did

not complain of any particular sharp pain after the first day or two except when he got in and out of his automobile and when he coughed. The coughing was more pronounced in the mornings.

Insured continued at his work and, on April 8, 1939, consulted Dr. John O. Skinner who, after an examination, advised him that he was suffering from a bilateral hernia. On April 12, 1939, by an arrangement with Dr. Skinner, he entered a hospital in Kansas City and the doctor operated on him for hernia the next day. Insured died at the hospital on May 21, 1939. The cause of death was due to "bronchial pneumonia," but the parties differ as to the cause of the disease.

It was plaintiff's contention at the trial that insured suffered the hernia from the fall and, therefore, as the result of an accident, and that his death was occasioned by the operation, in that, a lung abscess resulted from an embolus breaking off at the site of the operation and entering the blood stream and lodging in the lung tissue.

The facts further show that on April 8, 1939, insured's white blood count was 9500 and that on the day before the operation it was 13850. Dr. Skinner, testifying for plaintiff, stated that when he examined insured on April 8, he found insured's general physical condition to be good; that he found an inguinal hernia on the right side and a slight hernia on the left side; that he made a fluoroscopic examination of his lungs, heart and chest and another examination of his chest and found insured's physical condition to be good, except for the inguinal hernia on the right side; that this hernia was partially strangulated, not from a protrusion of the intestine into the hernia sac but on account of a piece of omental fat being therein; that by reason of the presence of the fat in the hernia sac inflammation had been set up therein. He testified that, while a white blood count from 7000 to 14000 is normal in some individuals, he attributed the increase in the white corpuscles from 9500 to around 13000 in this case to the inflammatory condition; that on the day or the day before the operation he examined insured again, making the usual examination of his heart, lungs, chest and taking his blood pressure, and that he found that they were all normal.

The doctor further testified that there was no unusual incident occurring during the operation; that the operation was performed successfully, and that the wound on each side healed nicely; that on the third to the sixth day after the operation insured had a sudden pain in his chest and increased respiratory action; that the witness immediately suspected that he had an embolus and caused X-ray pictures to be taken; that these showed an embolus in the lung, which often follows hernia operation; that "this gradual inflammatory blood clot exuded out through the tissues and developed into a lung abscess from which he died;" that this development was "post-operative complications." The doctor further testified that insured had a leukocyte count of around 9000 the morning after the operation, but he admitted that the hospital chart did not so show; that "if it isn't recorded, there

is an error of judgment on the part of the technician." On May 4 the white blood count was 23400 and on the next day it was 31800.

The doctor further testified that insured had had a light chronic cough for quite awhile before entering the hospital; that that was one of the reasons he checked him over with the fluoroscope, "we look every patient over the same way;" that in performing the operation, if the patient has a respiratory infection the operation is not performed; that one of the reasons is danger of pneumonia; that if insured had had infection in his respiratory tract the witness would not have performed the operation in question as no emergency was involved.

He further testified that the embolus in question was a blood clot which formed at the site of the operation; that an embolus floating off and lodging in the lungs is a rare thing, occurring about once in 1300 times.

The evidence shows that immediately following the operation, and upon coming out of the anesthetic, insured was in his room with the window open; that the weather was cold; that he suffered a severe chill; that a nurse was called and she gave him hot drinks and wrapped hot blankets around him and finally got him warm. Dr. Skinner was asked as to whether this chilliness was evidence of the beginning of pneumonia. He stated that when the patient in recovering from an anesthetic, after an operation, there is a degree of shock and chilliness and heat radiation from the body; that the "complaining of a slight chilliness is one of the common things;" that his embolus "hit him" (insured) when he had the pain from three to five days after the operation; that the witness signed the hospital record stating that insured suffered from "bronchial pneumonia followed with lung abscess and empyema;" that "bronchial pneumonia is the inflammatory condition around the embolus, that is a bronchial pneumonia that is tight, localized to a bronchus, followed with a lung abscess and empyema, which means pus in the lung cavity."

The hospital chart shows that on April 13, insured was given 1/6 grain of morphine and a small amount of atropine after the operation. The evidence shows that about this time insured's respiration had increased and the doctor testified that anyone who has pain breathes rapidly and 1/4 to 1/2 grain of morphine would have a tendency to decrease respiration and return the patient to normal; that the patient in this case did not have enough morphine to influence his respiration; that his increased respiration was noticed on the evening of April 13.

The evidence shows that on the morning of the day following the operation insured was coughing violently and spitting up large amounts of muccus tinged with pink. The doctor testified that he saw this; that "in giving this anesthetic with cyclonovocain, there was a rubber insulation in his mouth, and we had positive evidence of where it was coming from. Q. Now, is it a fact—A. But it wasn't from his lung."

Dr. Anderson, testifying for the plaintiff, stated that he administered the anesthetic to insured at the time of the operation; that he "went over his (insured's) chest in the operating room" to determine whether it would be all right to give him the anesthetic, and that his examination of insured was "negative;" that he found no reason why insured should not be given a general anesthetic; that his examination was made by the stethoscope, consisting of an examination of the chest, lung field, front and back; that any congestion or acute cold or similar condition would make it inadvisable to perform an operation; that one of the reasons why "we were checking" insured was that he had a white blood count that was above normal; that an increased blood count from 9500 to 13850 would make it very positive that insured had some kind of active infection in his system and would cause an inquiry to be made; that he had no information that insured's blood count had increased by nearly 5000 in the matter of three or four days but, if he had had he would have made the same examination.

Dr. Buckingham, testifying for plaintiff stated, that he was called into consultation at the hospital during the last illness of insured, about two weeks after the operation, and continued on the case until the death of the latter; that when he first saw him insured was a very sick man; that he had a rapid pulse, respiratory infection, complications and was suffering from bilateral pneumonia, "empyema or spot in his chest; what we specified as poisoned blood stream infection or blood poisoning; and a beginning of thrombosis in the face of his right lung, lung abscess;" that he participated with Dr. Kerr in the post-mortem examination; that the conditions which he found in insured's chest and lungs were complications following hernia operation; that a white blood count of 13850 ordinarily indicates infection; that an increased blood count from 9000 to 13850 in four or five days indicates an increase in that infection; that the presence of a cough with a white blood count of 13850 would make the doctor "still more suspicious of infection" and would cause him to suspect a respiratory infection; that in the autopsy he became acquainted with the fact that thrombi were found in the circulatory tract of the lungs, and that, in his opinion, the empyeme in this case was the result of the thrombi; that, in his opinion, lung abscesses develop from the type of pneumonia that insured contracted after the operation; that he did not think the clots came from the site of the operation; that pneumonia "was the direct result of the anesthetic, not of the operation but of the anesthetic."

Dr. Stowers, an expert witness for the defendant, did not see the insured. He testified that he examined photostatic copies of insured's hospital chart and made an examination of the post-mortem report; that the hospital chart showed that within 12 hours after insured was operated on he had a temperature of 102.4, pulse 114, respiration 26. In answer to a hypothetical question, assuming these facts, and

that the time insured entered the hospital, he had had a chronic cough and throat irritation for sometime sufficient to cause a hernia to bother him when he coughed, and that in less than 24 hours following the operation insured was coughing up thick grayish sputum, tinged with pink, what would be the opinion of the doctor as to whether insured was suffering from any respiratory disorder, at the time he entered the hospital: The doctor answered: "I feel he had an acute respiration infection. Q. What is that opinion based on? A. In the first place, he had a cough. A cough is a cough whether due to cigarettes or bronchitis, a cough is a cough. In the second place, he had a leukocytosis, increased white blood cell count; next, he had an elevation of temperature and increased respiration and increase in his pulse rate. Mr. DALEY: That, you know, is after the operation. A. Yes. Mr. DALEY: You understand that correctly? A. That is what you said in the question, after the operation, as I understand. Q. Twelve hours after the operation. A. And then of course the increase in the blood count was indicative of some infection some place, and with the cough before he went into the hospital and the morning of the operation, that would be indicative of some acute infection some place;" that from an examination of the records referred to, including the autopsy report, the witness had an opinion as to the origin of the lung abscesses from which insured died, and that was: "I think it was a result of his beginning acute respiratory infection, followed by pneumonia and pleurisy, and then secondary lung abscesses."

On cross-examination he testified: "The patient had had narcotics; after an operation a narcotic should slow the respiration. His re- spiration was increased." He testified on cross-examination that the inflammation from the strangulation caused by the omentum being in the hernia sac would not give as high a count as 13000 leukocyte; that it would have to be practically gangrenous before there would be that high a white count, and accompanied by many other symptoms; that it would make no difference in his conclusions even if an examination of insured, on the day he had a leukocyte count of 13800, had disclosed a normal chest and heart condition; that if a person, within 45 minutes after an operation, suffers a severe chill, it is due to some condition within the body; that the most logical thing to expect, particularly following a general anesthetic would be "a chill indicating the onset of pneumonia;" that this would indicate a "pre- existing condition in the lungs before the operation."

On re-direct examination the doctor testified that there is some normal slight post-operative temperature and slight pulse increase following an operation; that a "quarter of a grain of morphine, with an elevation of temperature and pulse, your respiration should be slowed down to sixteen per minute. Q. You noted the fact that this was twenty-six? Did that affect your opinion whether there was an acute respiratory condition at that time? A. Exactly. It is generally

felt that is one of the most important facts after an operation, especially,: twenty-six after a narcotic is given.''

Dr. Griffith, testifying for defendant, stated that on or about the. third day after the operation he was called into consultation; that after the death of insured he had a conversation with plaintiff, in which she said ''that she was very sorry that he (insured) had been operated on because of his *bronchial condition* or cold. Plaintiff denied this conversation. Dr. Griffith further testified that he was present when the post-mortem was had and saw the lung abscesses then; that insured ''had a bronchial condition, probably pneumonia,'' at the time he was called into the case.

Dr. Leitch, testifying for the defendant, stated, that he was a pathologist and that he examined the hospital records, including the autopsy report, after the death of the insured, and that he examined. with Dr. Kerr, who performed the autopsy, the microscopic preparations that were on file in connection with the post-mortem examination and that, in the opinion of the doctor, insured died as a result of lung abscesses with empyema; that ''there were observed on microscopic examination what are spoken of as thrombi in the vessels of the lung.'' In answer to a hypothetical question the doctor testified: ''My opinion is he was suffering from an acute respiratory infection at 8:00 in the evening of the day that he was operated on and also that, prior to that time, he had evidence of bronchial infection;'' that based upon information contained in the hospital records, including the autopsy report, his opinion was ''that the development of the evidence of bronchial pneumonia which became complicated by a lung abscess was in consequence or a result of an already present bronchial infection. Q. (By MR. RIGHTER): That is, he had a bronchial infection? A. I say that because of the fact that the intervals in which this inflammatory process blossomed out, in the course of the afternoon and that night, was too short a period, taking into consideration the incubation period, for an embolism to have been introduced into this man's body at the time. . . . Q. In your opinion, Doctor. if you have an opinion, from what did this pneumonia which resulted in these lung abscesses, from what did that pneumonia develop? A. I think it developed from particular organisms, from a result of chronic bronchial irritation. I think, furthermore, that the thrombi, which have been described by Dr. Kerr as existing in the lungs, had their origin because of irritation of the lung from pneumonia or lung abscess inflammatory action.'' Dr. Kerr did not testify.

On cross-examination, the witness was asked that if, on the morning of the 13th, after the operation, the blood count had returned to 9500, would his answer be any different, he replied: ''Well, cough is cough and it signifies irritation somewhere in the—in the irrigation passage in the bronchial tree and the presence of a leukocyte count of 13,850 in the absence of leukemia or some of the other processes that produce. elevations in blood count, my opinion would still be the same.''

He further testified: "If there was present strangulation of the blood supply to the omentum or necrosis of the omentum, then it possibly might produce an elevation in the white blood count, but I rather doubt it would be as much as 13,850."

On cross-examination, the doctor was asked whether the fact that two doctors in an examination of insured on the morning of the day before the operation, found his heart, chest and blood count normal, would change his opinion and, he replied, that he would still be of the opinion something was irritating insured's blood. On re-direct examination, the doctor testified: "Q. Doctor, in saying that the pathologist's report upon *the condition of the tissue removed from the site of this right hernia did not evidence any condition of irritation or inflammation,* is the sheet I show you here from the Department of Pathology the report on which you were relying? A. That is right."

There is much in the briefs on both sides as to whether the hernia suffered by insured, during the series of events following the beginning of his pushing the automobile and ending with his fall, was suffered as a result of an accident within the meaning of that term as used in the double indemnity provision of the policy in suit. It seems to be admitted that, if the hernia occurred during the pushing that it was not the result of such an accident, while, if it occurred after the pushing, it was. [On this point see the leading case of Caldwell v. Travelers' Ins. Co., 267 S. W. 907.] There was expert testimony on the subject as to when the hernia occurred. All of the doctors admitted that it occurred at the moment of the greatest intra-abdominal pressure, defendant's witnesses being of the opinion that this occurred at the time insured was pushing upon the automobile, and plaintiff's doctors that it occurred either during the time of the slipping and falling of the insured or when he struck the pavement.

It is not necessary for us to examine into this phase of the case for the reason that we find that it may be disposed of on the theory that the hernia was the result of an accident, with in the meaning of the terms of the policy. However, from our statement of the facts relating to the immediate cause of insured's death, it will be found that the evidence is sharply conflicting as to whether it was caused by an embolus being carried in the blood stream to the lung, as a result of the operation, and thus giving rise to the complications mentioned in the testimony, or, by reason of a bronchial infection existing at the time insured entered the hospital.

It is conceded that defendant would not be liable for death caused by the latter. [See on this point Probst v. Capital Mut. Ass'n, 124 S. W. (2d) 515.]

All of the documentary evidence involved in this case is undisputed but most of the testimony is oral. Under such circumstances, it is the rule, in equity actions, that the appellate court will not ordinarily interfere with the conclusion reached by the chancellor owing to his peculiar advantage growing out of the fact that he has heard the

witnesses and observed them as they testified. [Laitner P. & H. v. Platt Land Co., 67 S. W. (2d) 524; Yellow Mfg. Acceptance Corp. v. Am. Taxicabs, Inc., 130 S. W. (2d) 601; Stibal v. Nation et al., 98 S. W. (2d) 724; Longwell v. Willbanks, 106 S. W. (2d) 417.]

However, plaintiff states that there is no substantial evidence to support the judgment. A mere reading of the evidence, as we have detailed it, shows to the contrary. The burden of proof was on the plaintiff. The chancellor may have arrived at the conclusion that this burden was not sustained by her because he was not convinced that insured died as a result of the matters involved in plaintiff's theory of the case as to the cause of the pneumonia.

Defendant's answer consists of a general denial and a pleading that insured's death resulted from an illness or a disease within the meaning of the policy. It then avers that plaintiff elected to take under Option 1 of the optional methods of settlement in the policy, surrendered it for cancellation, and that the policy has ceased to be a subsisting contract, and that plaintiff's only remedy is in equity for the reinstatement and enforcement of the contract. The answer also alleges that due proof was never furnished defendant that the death of insured resulted from an accidental cause.

In the answer then appears what is termed "Petition for Declaratory Judgment," in which it is set up that due proof that death resulted from an accident had not been furnished; that the policy had been surrendered to defendant, and cancelled, and was not enforcible, except in equity, and that a bona fide controversy has arisen between the parties. Defendant then prays for a declaration of the rights of the parties.

Plaintiff's reply denies the allegations contained in the answer and expressly denies that she had surrendered the policy to the defendant for cancellation. It admits that a controversy has arisen between the parties and consents that the court, sitting in equity, shall determine the same, admits certain portions of defendant's Petition for Declaratory Judgment, and agrees that the court shall find and declare the rights of the parties.

Plaintiff insists that the court erred in rendering judgment merely "that plaintiff is not entitled to recover but should have declared the rights of the parties." Defendant contends that the judgment is sufficient to comply with the statute relative to the form of the judgment in declaratory actions. [See Secs. 1126-1140, R. S. Mo. 1939.]

The remedy by a declaratory judgment cannot be made a substitute for all existing remedies and should be used with caution. The use of such judgment rests in the sound judicial discretion of the court, depending on the circumstances. That form of relief is usually unnecessary where a full and adequate remedy is provided by a well known form of action. Such proceedings do not supersede existing remedies. All of the facts set forth in defendant's so-called "Petition for Declaratory Judgment," could be, and were, properly set up as

a defense to plaintiff's cause of action, and it is quite apparent that a declaratory judgment proceeding has no place in this case. [Liberty Mutual Ins. Co. v. Jones, 130 S. W. (2d) 945; State ex rel. K. C. Bridge Co. v. Terte, 131 S. W. (2d) 587; Aetna Life Ins. Co. v. Richmond (Conn.), 139 Atl. 702; Aetna Life Ins. Co. v. Bellas (Tenn.), 13 S. W. (2d) 795; Nesbit v. Mfgs. Cas. Ins. Co. (Pa.), 165 Atl. 403.]

The parties evidently invited the chancellor to proceed under the Declaratory Judgment Act, but he rejected the request.

However, assuming that the court erred in not declaring the rights of the parties and that the judgment does not comply with the statute, as plaintiff contends, the point made is not preserved in plaintiff's motion for a new trial. The motion contains an assignment that "the finding and judgment is irregular, erroneous and defective and not in proper form." This assignment is not sufficient upon which to base the point urged by plaintiff. [Sweet v. Maupin, 65 Mo. 65, 68, 69; Colin v. Moldenhauer, 92 S. W. (2d) 601; Colin v. Moldenhauer, 338 Mo. 827.]

We are of the opinion that no reversible error was committed in respect to this matter.

The judgment is affirmed. All concur.